CATALANO, INC., ET AL. *v.* TARGET SALES, INC., ET AL.

No. 79–1101.   Decided May 27, 1980

PER CURIAM.

Petitioners, a conditionally certified class of beer retailers in the Fresno, Cal., area, brought suit against respondent wholesalers alleging that they had conspired to eliminate short-term trade credit formerly granted on beer purchases in violation of § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U. S. C. § 1.   The District Court entered an interlocutory order, which among other things, denied petitioners' "motion to declare this a case of *per se* illegality," and then certified to the United States Court of Appeals for the Ninth Circuit, pursuant to 28 U. S. C. § 1292 (b),[1] the

---

[1] Title 28 U. S. C. § 1292 (b) provides:

"When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.   The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not

question whether the alleged agreement among competitors fixing credit terms, if proved, was unlawful on its face.[2] The Court of Appeals granted permission to appeal, and, with one judge dissenting, agreed with the District Court that a horizontal agreement among competitors to fix credit terms does not necessarily contravene the antitrust laws. 605 F. 2d 1097 (1979).[3] We grant the petition for certiorari and reverse the judgment of the Court of Appeals.

For purposes of decision we assume the following facts alleged in the amended complaint [4] to be true. Petitioners allege that, beginning in early 1967, respondent wholesalers secretly agreed, in order to eliminate competition among themselves, that as of December 1967 they would sell to retailers only if payment were made in advance or upon delivery. Prior to the agreement, the wholesalers had extended credit without interest up to the 30- and 42-day limits permitted by state law.[5] According to the petition, prior to the agreement wholesalers had competed with each other with respect

---

stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order."

[2] In pertinent part, the District Judge's order read as follows:

" 'In the opinion of the Court, this order involves a controlling question of law, whether an agreement among competitors to eliminate the extension of trade credit constitutes a *per se* violation of Section 1 of the Sherman Act (15 U. S. C. § 1), as to which there is substantial ground for difference of opinion, and that an immediate appeal from the order will materially advance the ultimate termination of the litigation since this issue is central to the conduct of discovery and trial of this case.' " App. D to Pet. for Cert.

[3] The District Court had also granted summary judgment against two plaintiffs for failure to establish injury in fact. Those plaintiffs appealed separately. The Court of Appeals consolidated their appeal with the appeal taken pursuant to § 1292 (b) and unanimously reversed that portion of the District Court's order. No review is sought in this Court of that ruling.

[4] See Record 152.

[5] Cal. Bus. & Prof. Code Ann. § 25509 (West Supp. 1980).

to trade credit, and the credit terms for individual retailers had varied substantially.[6]  After entering into the agreement, respondents uniformly refused to extend any credit at all.

The Court of Appeals decided that the credit-fixing agreement should not be characterized as a form of price fixing. The court suggested that such an agreement might actually enhance competition in two ways: (1) "by removing a barrier perceived by some sellers to market entry," and (2) "by the increased visibility of price made possible by the agreement to eliminate credit."  *Id.*, at 1099.

In dissent, Judge Blumenfeld[7] expressed the opinion that an agreement to eliminate credit was a form of price fixing. *Id.*, at 1104.  He reasoned that the extension of interest-free credit is an indirect price reduction and that the elimination of such credit is therefore a method of raising prices:

> "The purchase of goods creates an obligation to pay for them.  Credit is one component of the overall price paid for a product.  The cost to a retailer of purchasing goods consists of (1) the amount he has to pay to obtain the goods, and (2) the date on which he has to make that payment.  If there is a differential between a purchase for cash and one on time, that difference is not interest but part of the price.  See *Hogg* v. *Ruffner*, 66 U. S. (1 Black) 115, 118–119 . . . (1861).  Allowing a retailer interest-free short-term credit on beer purchases effectively reduces the price of beer, when compared to a requirement that the retailer pay the same amount immediately in cash; and, conversely, the elimination of free credit is the equivalent of a price increase."  *Id.*, at 1103.

It followed, in his view, that the agreement was just as plainly anticompetitive as a direct agreement to raise prices.  Con-

---

[6] Pet. for Cert. 4.

[7] Senior District Judge for the District of Connecticut, sitting by designation.

sequently, no further inquiry under the rule of reason, see *National Society of Professional Engineers* v. *United States,* 435 U. S. 679 (1978), was required in order to establish the agreement's unlawfulness.

Our cases fully support Judge Blumenfeld's analysis and foreclose both of the possible justifications on which the majority relied.[8] In *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.,* 441 U. S. 1, 7–8 (1979), we said:

> "In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain agreements or practices are so 'plainly anticompetitive,' *National Society of Professional Engineers* v. *United States,* 435 U. S. 679, 692 (1978); *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36, 50 (1977), and so often 'lack . . . any redeeming virtue,' *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1, 5 (1958), that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases." [9]

---

[8] Respondents nowhere suggest a procompetitive justification for a horizontal agreement to fix credit. Their argument is confined to disputing that settled case law establishes that such an agreement is unlawful on its face.

[9] The quotation from *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5 (1958), is drawn from the following passage: "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation . . .—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing. . . ."

A horizontal agreement to fix prices is the archetypal example of such a practice. It has long been settled that an agreement to fix prices is unlawful *per se*. It is no excuse that the prices fixed are themselves reasonable. See, *e. g.*, *United States* v. *Trenton Potteries Co.*, 273 U. S. 392, 397–398 (1927); *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 340–341 (1897). In *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150 (1940), we held that an agreement among competitors to engage in a program of buying surplus gasoline on the spot market in order to prevent prices from falling sharply was unlawful without any inquiry into the reasonableness of the program, even though there was no direct agreement on the actual prices to be maintained. In the course of the opinion, the Court made clear that

> "the machinery employed by a combination for price-fixing is immaterial.
>
> "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*." *Id.*, at 223.

Thus, we have held agreements to be unlawful *per se* that had substantially less direct impact on price than the agreement alleged in this case. For example, in *Sugar Institute* v. *United States*, 297 U. S. 553, 601–602 (1936), the Court held unlawful an agreement to adhere to previously announced prices and terms of sale, even though advance price announcements are perfectly lawful and even though the particular prices and terms were not themselves fixed by private agreement. Similarly, an agreement among competing firms of professional engineers to refuse to discuss prices with potential customers until after negotiations have resulted in the initial selection of an engineer was held unlawful without requiring further inquiry. *National Society of Professional Engineers* v. *United States, supra*, at 692–693. Indeed, a horizontal agreement among competitors to use a

specific method of quoting prices may be unlawful. Cf. *FTC* v. *Cement Institute*, 333 U. S. 683, 690–693 (1948).[10]

It is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. Thus, credit terms must be characterized as an inseparable part of the price.[11] An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing.[12] While it

---

[10] The Court there held that an agreement to use a multiple basing point pricing system was an unfair method of competition prohibited by § 5 of the Federal Trade Commission Act, 15 U. S. C. § 45, even though the same conduct would also violate § 1 of the Sherman Act.

[11] See *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, 394 U. S. 495, 507 (1969): "In the usual sale on credit the seller, a single individual or corporation, simply makes an agreement determining when and how much he will be paid for his product. In such a sale the credit may constitute such an inseparable part of the purchase price for the item that the entire transaction could be considered to involve only a single product."

See also G. Lamb & C. Shields, Trade Association Law and Practice 129 (rev. ed. 1971) ("Credit terms are increasingly viewed as elements of price, and any interference with the elements of price is regarded as illegal per se under the Sherman Act"). Cf. P. Areeda, Antitrust Analysis 878 (2d ed. 1974) ("To charge cash and credit customers the same price is, economically speaking, to discriminate against the former"); *Hogg* v. *Ruffner*, 1 Black 115, 118–119 (1861).

[12] Cf. *Cement Mfrs. Protective Assn.* v. *United States*, 268 U. S. 588, 600 (1925), in which the Court upheld an exchange of information concerning credit in order to prevent fraud on the members of the association, but also noted that "[t]he evidence falls far short of establishing any understanding on the basis of which credit was to be extended to customers or that any co-operation resulted from the distribution of this information, or that there were any consequences from it other than such as would naturally ensue from the exercise of the individual judgment of manufacturers in determining, on the basis of available information, whether to extend credit or to require cash or security from any given customer."

See also *Swift & Co.* v. *United States*, 196 U. S. 375, 392, 394 (1905);

may be that the elimination of a practice of giving variable discounts will ultimately lead in a competitive market to corresponding decreases in the invoice price, that is surely not necessarily to be anticipated. It is more realistic to view an agreement to eliminate credit sales as extinguishing one form of competition among the sellers. In any event, when a particular concerted activity entails an obvious risk of anticompetitive impact with no apparent potentially redeeming value, the fact that a practice may turn out to be harmless in a particular set of circumstances will not prevent its being declared unlawful *per se*.

The majority of the panel of the Court of Appeals suggested, however, that a horizontal agreement to eliminate credit sales may remove a barrier to other sellers who may wish to enter the market. But in any case in which competitors are able to increase the price level or to curtail production by agreement, it could be argued that the agreement has the effect of making the market more attractive to potential new entrants. If that potential justifies horizontal agreements among competitors imposing one kind of voluntary restraint or another on their competitive freedom, it would seem to follow that the more successful an agreement is in raising the price level, the safer it is from antitrust attack. Nothing could be more inconsistent with our cases.

Nor can the informing function of the agreement, the increased price visibility, justify its restraint on the individual wholesaler's freedom to select his own prices and terms of sale. For, again, it is obvious that any industrywide agreement on prices will result in a more accurate understanding of the terms offered by all parties to the agreement. As the *Sugar Institute* case demonstrates, however, there is a plain distinction between the lawful right to publish prices and terms of sale, on the one hand, and an agreement among competitiors

---

*Wall Products Co.* v. *National Gypsum Co.*, 326 F. Supp. 295 (ND Cal. 1971).

limiting action with respect to the published prices, on the other.

Thus, under the reasoning of our cases, an agreement among competing wholesalers to refuse to sell unless the retailer makes payment in cash either in advance or upon delivery is "plainly anticompetitive." Since it is merely one form of price fixing, and since price-fixing agreements have been adjudged to lack any "redeeming virtue," it is conclusively presumed illegal without further examination under the rule of reason.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*