**JAYS FOODS, INC., Plaintiff,**

v.

**NATIONAL CLASSIFICATION COMMITTEE and National Classification Board, Defendants.**

**Civ. A. No. 85–489–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 22, 1985.

Robert J. Segan, Kass & Skalet, P.C., Annandale, Va., Anthony S. DiVincenzo, Campbell & DiVincenzo, Chicago, Ill., for plaintiff.

Charles E. Buffon, Stephen G. Rademaker, Covington & Burling, Washington, D.C., Thomas Moncure, William W. Pugh, Gen. Counsel, Nat. Motor Freight Traffic Ass'n, Inc., Alexandria, Va., for defendants.

### MEMORANDUM OPINION

BRYAN, Chief Judge.

Tried to the court on November 4–5, 1985, this action seeks injunctive relief for an alleged violation of Section 1 et seq. of The Sherman Act, 15 U.S.C. § 1 et seq. Jurisdiction is based on Section 4 of that act and Section 16 of The Clayton Act, 15 U.S.C. § 26. Decision was reserved to allow the court to read a deposition, and for the parties to prepare and the court to consider post trial briefs. This has been accomplished.

The parties, commendably, have filed an extensive stipulation of facts and those "Stipulated Facts" are attached as Appendix A. That stipulation contains most of the material facts at issue, and the live testimony resulted in only a few additional factual issues to resolve.

The amended complaint alleges, and at trial the plaintiff asserted, a *per se* violation of The Sherman Act. The violation results allegedly from price fixing of rates for interstate shipments of agricultural commodities by motor carriers.

It is alleged that a conspiracy to fix the rates is indirectly accomplished through the publication of the National Motor Freight Classification (the Classification) (PX 1) by the defendants, National Classification Committee (NCC) and National Classification Board (NCB). Under existing law motor carrier rate bureaus have antitrust immunity jointly to set freight rates for commodities regulated by the Interstate Commerce Commission (ICC). Agricultural commodities (such as potatoes) are exempt from regulation by the ICC, however, and the fixing of rates for those commodities by the motor carriers would not have antitrust immunity.

The plaintiff, Jays Foods, Inc., is a manufacturer of, among other things, potato chips. It purchases raw potatoes, which are of course an agricultural commodity, and which are shipped to it by interstate carriers.

The Classification contains no freight prices or formula for determining freight prices. It rates potatoes in the following manner:

| Item | ARTICLES | ¶CLASSES MW | | |
|---|---|---|---|---|
| | | LTL | TL | ¶ |
| 78200 | Potatoes, Sweet Potatoes or Yams, LTL, in baskets with slatted or solid covers, in standard bushel baskets, see Note, item 77522, in bags, barrels, boxes or crates, or in barrels with cloth tops; TL, loose or in packages .. | 60 | 35 | 36 |

(PX 1, p. 490)

In the listing LTL stands for less than truckload, TL stands for truck load, and MW stands for minimum weight.

It is the plaintiff's position, quite simply, that the Classification, while not having any actual pricing or rate content, is the departure point for the fixing of rates. The plaintiff argues that the inclusion of non-regulated commodities in the publication, along with regulated commodities, amounts to price fixing. This is so, the argument goes, because by combining all commodities, regulated and non-regulated, into classifications based upon transportation characteristics, the pricing scheme in effect also applies to non-regulated commodities (or at least allows a ready comparison with rates set by rate bureaus).

Plaintiff's analysis springs, in large part, from a statement made by the NCC to the ICC in connection with a 1983 proceeding. The NCC, in the *Investigation into Motor Carrier Classification* [Ex Parte MC–98 (Sub. No. 1) ] 367 ICC 243, 246 (1983), stated that:

> The commodity classification is the "linch pin" of the carrier rate-making system in general, and the collective ratemaking system in particular. (NCC statement at p. 13.)

The plaintiff argues that this is a concession by the NCC that the Classification is a substantial part of a scheme which permits motor carriers jointly to set rates, or fix prices, for the interstate shipment of agricultural products. Put another way, the NCC, whose members are all truckers, through its publication of the Classification becomes a motor carrier rate bureau.[1]

If, in fact, the Classification operates to fix rates on the interstate shipment of agricultural commodities, then this is a *per se* antitrust violation. Whether it results in more rather than less competition, or is found lawful through application of the rule of reason, is irrelevant. *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 344, 351, 102 S.Ct. 2466, 2476, 73 L.Ed.2d 48 (1982).

Whether to apply the *per se* rule in this case depends upon whether "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). We are cautioned, too, not to employ the *per se* rule "until after considerable experience with the type of challenged restraint." *Id.*, fn. 33. Another court has phrased the *Broadcast Music* holding in this way: "[I]n

---

1. There is a statement in *Reclassification of Pork Skins and Bacon Rinds*, NMFC, M–30360, ICC, July 20, 1983, that NCC, through the National Motor Freight Transportation Association, is a rate bureau. The court disagrees with this.

other words, if the elimination of competition is apparent on a quick look, without undertaking the kind of searching inquiry that would make the case a Rule of Reason case in fact if not in name, the practice is illegal *per se.*" *General Leaseways v. National Truck Leasing*, 1984–2 Trade Cas. (CCH), ¶ 66,205, 66,796–7 (7th Cir.1984).

■ Looking at the practice facially, giving it a "quick look" and considering the experience and history of this particular challenged restraint, the activity of publication of the Classification does not meet the test of the cited authorities for a *per se* violation.

First of all, it is not either the function or purpose of the Classification to impact prices in the market. Indeed neither the function nor the effect of the Classification has precluded carriers from offering various price options, or from establishing or negotiating competitive rates. Nor are truck rates for agricultural products stabilized, artificially or otherwise. The "linch pin" statement, made in the context of a *regulated* commodity inquiry, was part of an investigation that led to a revision of the Classification so as to eliminate certain characteristics from consideration in arriving at a classification. Among those eliminated, as being rate-making in function, were value of service, trade condition and competition with other commodities.[2] With the removal of these the ICC found the Classification would "serve as a useful reference tool." *Investigation Into Motor Carrier Classification, supra,* at 252. The Classification has been revised to eliminate the three characteristics, although only prospectively, i.e., upon a reclassification of a commodity. Such a prospective implementation of the change was permitted by the ICC. *Id.* at 256.

The Classification is a useful reference tool in the setting of rates. But it is no more than that. And indeed, while perhaps not relevant in a *per se* inquiry, insofar as

this case is concerned there is no evidence that it has been used even as a reference tool in fixing interstate rates on agricultural commodities.

The plaintiff points out that the classification of potatoes contains a different class for truckload (TL) shipments than for less than truckload (LTL). It argues that the sole purpose of the TL is to provide a volume discount, a rate-making function. It makes a similar analysis with the minimum weight (MW) class. The ICC, in *Investigation Into Motor Carrier Classification, supra,* opined that TL ratings "should be rare" and when they exist, "differences [between LTL and TL] ratings are inherently suspect, and the NCC should be prepared to explain when called on to do so." *Id.* at 254. The right to make such an explanation is inconsistent with any *per se* treatment of the activity. Moreover, as to the MW class, the ICC further stated that " ... to the extent that the data are useful, the NCC can supply the information other than through tariff format and without the necessity for antitrust immunity." *Id.*

The ICC case, again, was decided in the context of a *regulated* commodity. But to the extent it is relevant here, the ICC's directives have been followed. The 1985 issue of the Classification (PX 1), at page 3, makes specific reference to the ICC decision and in fact eliminates the difference between LTL and TL (accordingly the commodities an LTL class designation in all cases). Filed with the ICC, it has occasioned no exception by that body as to compliance with its decision. All that MW means in the context of an unregulated commodity is that it tells a trucker he can load that minimum amount in an average size truck.

Second, the conduct of the defendants in this case is just not price fixing, nor can it be considered so by attempting to label it as "tampering" with price structures or

---

**2.** There is no evidence that these three characteristics were used in any agricultural classification. There is evidence that other factors, not included in the four characteristics used, such

as distance, post prices, size of tractor-trailer, fuel and labor costs and state maximum weights, may play roles in rate setting by a trucker.

"interference" with market forces. The Classification is useful, of course, in setting shipping rates and may affect such rates. But so do road maps.

This case is much more akin to those cases cited by the defendants, *Maple Flooring Association v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925) (computation by trade association and distribution among its members as to average cost of their products, freight rates, quantities of flooring sold, inventories); *Tag Manufacturer Institute v. FTC*, 174 F.2d 452 (1st Cir.1949) (distribution by trade association of price lists); *Ashby Meadow Farms v. American Home Shows Association*, 609 F.Supp. 677 (S.D.N.Y. 1985) (home show association classification rules); and *United States v. American Society of Anesthesiologists*, 473 F.Supp. 147 (S.D.N.Y., 1979) (guide setting forth unit time and anesthesia values for 1450 surgical procedures), than it is to those cited by the plaintiff. *Arizona v. Maricopa County Medical Society, supra* (agreements to set maximum fees); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (agreements on credit terms held tantamount to agreement to eliminate discounts); *Plymouth Dealers Association of Northern California v. United States* (agreement on suggested prices to be used as a starting point for individual negotiations); and *United States v. Nationwide Trailer Rental System*, 156 F.Supp. 800 (D.Kan.) *aff'd.* 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20 (1957) (publication and dissemination of suggested prices even though the defendants do not adhere to them).

Third, the effect on competition of the practice of publishing this Classification cannot be discerned by any "quick look." A much more searching analysis is required. Consideration of the defendants' justification for any apparent effect on competition[3] is required. Its explanation, for example, of the use of LTL, TL and MW classifications, should be heard. *Cf. National Collegiate Athletic Ass'n. v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

Fourth, the classification system, applicable originally to products shipped by rail and which was without antitrust immunity, historically has not been thought to be in violation of the antitrust laws—at least not by the ICC (DX 29, DX 30). The Department of Justice, in its appearance before the Motor Carrier Rate-Making Study Commission established by the Motor Carriers Act of 1980, took the position that the Classification, with the elimination of the aspects found to be rate-making in function by the ICC, was (in the words of the Commission) "benign" in its "[anti] competitive character." DX 21, p. 504. The Commission itself recognized the distinction between classification, i.e., analysis of the commodity, and rate making. DX 21, pp. 436–57, 497–505, 534. *See also* Remarks Before the Association of Transportation Practitioners by James R. Weiss, Assistant Chief, Transportation Section, Antitrust Division, U.S. Department of Justice (DX 32, p. 17).

Finding no evidence to support application of the *per se* rule to the practices of the defendants challenged here, and no other evidence of a violation of the Sherman

---

**3.** Because the plaintiff pitched its case solely on its *per se* theory, the evidence of the defendants stands uncontradicted that truck rates for transportation of agricultural commodities fluctuate substantially and frequently in response to forces of supply and demand; that the return in equity for truckers generally has declined dramatically after 1980, the date of the enactment of the Motor Carrier Act of 1980 which substantially deregulated the trucking industry and made major change in such regulation; that indeed, rather than having been affected anti-

competitively by the Classification, interstate shipping of agricultural commodities remains a prime example, from an economist's view, of pure competition because of, among other factors, the lack of any appreciable barriers to entry into that field; that the seller of plaintiff's potatoes, Rubin, negotiated rates with truckers using as a beginning point their rate sheets; that Rubin characterized the negotiations as a constant battle; and that there was substantial competition among truckers for his business.

Act being proffered, the amended complaint will be dismissed.

The foregoing ruling obviates any need for the court to resolve the issues raised by the defendants' other two defenses, namely, lack of standing and immunity under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Suffice it to say, however, that insofar as standing is concerned, the uncontradicted evidence of Marvin J. Rubin, who sold the plaintiff 90% of its potatoes, is that the Classification has never been used by any trucker shipping potatoes to the plaintiff in fixing any freight rate. Moreover, the threat of such use is too speculative to justify any injunctive relief otherwise awardable under § 16 of the Clayton Act.

## APPENDIX A

Aug. 15, 1985

### STIPULATED FACTS

1. Plaintiff, Jays Foods, Inc., ("Jays"), is an Illinois corporation having its principal place of business in Chicago, Illinois.

2. Jays manufactures and sells potato chips, popcorn, and shoestring potato chips.

3. Jays distributes other snack foods, including corn chips, pretzels, tortilla chips, and cheese puffs.

4. Defendant National Classification Committee ("NCC") is an autonomous committee of the National Motor Freight Traffic Association composed of one hundred elected representatives of motor carriers operating in each of the forty-nine continental states of the United States, the District of Columbia and Canada.

5. The NCC publishes the National Motor Freight Classification (the "Classification") in accordance with an Agreement with the Interstate Commerce Commission ("ICC") as amended May 26, 1981.

6. The Classification contains ratings of all commodities carried by truck in the United States. The classification assigns a numerical rating to each commodity based upon an evaluation of four transportation characteristics of each such commodity.

7. Pursuant to direction of the ICC, the four criteria that NCC is to employ in determining the commodity ratings appearing in the Classification are: (1) density, (2) potential liability, (3) handlability and (4) loadability.

8. In accordance with its agreement with the ICC, the NCC considers and renders decisions on proposed changes in the commodity ratings published in the Classification.

9. Defendant National Classification Board (NCB) is composed of staff personnel appointed and supervised by the NCC which gather facts for and provide analyses of transportation characteristics to the NCC.

10. The Classification contains ratings of commodities the transport of which by motor carriers in interstate commerce is regulated by the ICC and commodities the transport of which by motor carriers is not subject to ICC regulation.

11. Agricultural commodities transported by motor carriers are exempt from regulation by the ICC.

12. Several states regulate the transport by motor carrier of agricultural commodities in intrastate commerce within those states, and several states do not.

13. Several states regulate the transport by motor carrier of raw potatoes and unpopped popcorn in intrastate commerce within those states, and several states do not.

14. Agricultural commodities are rated in the Classification.

15. Pursuant to procedures stipulated in NCC's agreement with the ICC, motor carriers have the right to become a "Participant" in the Classification entitled to vote in the election of the members of the NCC.

16. Pursuant to NCC's agreement with the ICC, which is required to be signed and submitted to the ICC by each Participant in the Classification: "Each party to this Agreement shall have the full and unrestrained right to take independent action at any time either before or after any deter-

mination arrived at through any procedure provided in these rules. Nothing in the rules shall prevent any participating carrier from publishing or causing to be published or concurring in any Classification or in any tariff or tariff containing exceptions to the Classification or to any or all provisions thereof."

17. Pursuant to NCC's agreement with the ICC, proposals for changes in the Classification and of the ratings assigned to any commodity appearing in the Classification "may be filed by any person, firm or corporation having an interest in the contents of the Classification," including shippers.

18. Jays has never initiated a proposal for any change in any rating appearing in the Classification.

19. Pursuant to NCC's agreement with the ICC, "All persons (shippers, receivers, etc.) shall be permitted to present their views orally and/or in writing with respect to any proposal to establish a change of rate, classification, rating, rule, regulation, minimum weight, packaging equivalent requirement, or other tariff provision docketed before the Committee. They may so participate individually or collectively through membership in leagues, associations, institutions, organizations or other groups. Such persons may at the same time participate individually in these same matters."

20. Pursuant to NCC's agreement with the ICC, "public hearings shall be conducted on all pending proposals" for changes in any rating appearing in the Classification.

21. Jays has never appeared at an NCC hearing or submitted its views orally or in writing, directly or indirectly, with respect to any rating appearing in the Classification.

22. The Classification is available for purchase by any member of the public, including shippers.

23. The Classification has over twelve thousand five hundred subscribers, approximately six thousand of which are shippers.

24. Jays has never subscribed to the Classification and has never used or referred to the Classification in the course of its business.

25. Jays purchases two agricultural commodities, raw potatoes and unpopped popcorn.

26. Raw potatoes and popcorn are among the agricultural commodities transport of which by motor carrier is exempt from regulation by the ICC.

27. Raw potatoes and unpopped popcorn are rated in the Classification.

28. Jays purchases unpopped popcorn by one of two methods: (1) purchase on a delivered price basis and (2) purchase for "backhaul" delivery in trucks used by Jays to distribute its snack-food products.

29. Jays plays no role in arranging transportation of unpopped popcorn purchased on a delivered price basis and has no knowledge of what carriers deliver the popcorn, how much is paid for delivery or how the delivery price is established. All transportation arrangements and costs with respect to such deliveries are the responsibility of the seller.

30. Jays has no knowledge or information of any use or reference to the Classification or any of its contents in connection with its suppliers' arrangement for delivery of unpopped popcorn purchased by Jays on a delivered price basis.

31. Previous to May 27, 1985, Jays snack foods were delivered to its distribution points in semi-trailer trucks pursuant to a contract with Nielson Cartage Company ("Nielson"). Subsequent to May 17, 1985, such deliveries have been made by the Willett Company ("Willett").

32. Nielson and, subsequently, Willett have "backhauled" some unpopped popcorn purchased by Jays in locations near the distribution points to which these two companies delivered Jays snack food products.

33. Unpopped popcorn backhauled by Nielson was paid for by Jays as part of the hourly cost for tractors and weekly cost for trailers paid to Nielson by Jays for the delivery of its snack food products.

34. To the knowledge of Joseph Toscano, Jays Vice President of Finance, and the

person designated by Jays as having knowledge of the subject, no mention or reference to the Classification or any of its contents was ever made in connection with Jays arrangement for the backhaul of popcorn by Nielson.

35. Jays pays Willett a price for each round-trip "run" made by Willet's Trucks between Chicago and each of Jays distribution points. The price per run is separately negotiated for each distribution point. No separate or additional amount is paid by Jays to Willett for the backhaul of popcorn.

36. No mention or reference to the Classification has ever been made in connection with Jays arrangement for the backhaul of popcorn by Willett.

37. For many years, Jays has purchased all of its potato requirements (except for purchases from Hoekstra) from Jack Rubin & Son, Inc., a potato distributor headquartered in Chicago. Marvin Rubin is the president of Jack Rubin & Son, Inc. ("Rubin"), and he has personal knowledge of the sale and delivery of potatoes to Jays by Rubin.

38. Rubin buys potatoes and sells them to Jays. Jays has never arranged for the transport of any of the potatoes purchased from Rubin or made any direct payments to any carrier for such transportation.

39. Rubin contracts and makes payment to carriers for the transportation to Jays manufacturing plant of all potatoes Rubin sells to Jays.

40. Rubin contracts for the shipment of potatoes to Jays by rail in boxcars, by rail in piggy back trailers and by truck, and some of such shipments travel in interstate commerce.

41. Rubin does not subscribe to the Classification, and it has never used or referred to the Classification in connection with arranging transportation of potatoes to Jays. Marvin Rubin could not recall the Classification or any of its contents ever being mentioned in connection with arranging delivery of potatoes to Jays.

42. Most truck deliveries of potatoes sold to Jays by Rubin are made by Quality Trucking Company ("Quality"), which is headquartered in Antigo, Wisconsin. Quality is not a participant in the National Classification Committee or the Classification and is not a subscriber to the Classification.

43. Jays' only supplier of potatoes other than Rubin is Hoekstra, a potato grower located in St. Anne, Illinois. Hoekstra sells potatoes to Jays on a delivered price basis, and Jays does not participate in arrangement of transportation of potatoes purchased from Hoekstra to Jays' plant.

44. Jays has no knowledge or information as to what carriers deliver Hoekstra's potatoes to Jays, how much Hoekstra pays for such delivery or how the delivery price is determined. All transportation arrangements entered into with respect to such deliveries are the responsibility of Hoekstra.

45. Hoekstra is not a participant in the NCC or the Classification and does not subscribe to the Classification.

46. Jays has no knowledge or information of any use or reference to the Classification or any of its contents in connection with sale and delivery of potatoes to Jays by Hoekstra.