## ASSOCIATION OF RETAIL TRAVEL AGENTS, LTD. (ARTA), Plaintiff,

v.

## AIR TRANSPORT ASSOCIATION OF AMERICA (ATA), et al., Defendants.

Civ. A. No. 84-2942.

United States District Court,
District of Columbia.

Dec. 3, 1985.

Barry Roberts, Roberts & Singer, Washington, D.C., for plaintiff.

David B. Lytle, Harry T. Jones, Jr., Hogan & Hartson, Washington, D.C., for defendants.

### MEMORANDUM

OBERDORFER, District Judge.

#### I.

This action is brought by the Association of Retail Travel Agents, Ltd. (ARTA), against the Air Transport Association of America (ATA), its member air carriers, and members of the ATA board of directors. The Airlines Reporting Corporation (ARC) program is run by ATA and coordinates the dealings between the airline members and the travel agencies with which the members deal. ARTA alleges that aspects of the ARC program are anticompetitive and in violation of federal antitrust laws. Because of the complex issues presented in this case, the Court adopted a "wave" discovery plan. The Court's Second Wave Discovery Order (filed May 29, 1985) directed the parties to conduct discovery and file dispositive motions on the *per se* issues raised by plaintiff's complaint. The action is now before the Court

on the parties' cross-motions for summary judgment on the *per se* issues.

Plaintiff claims that two general types of provisions of the ARC program constitute price fixing and are therefore *per se* illegal. First, plaintiff challenges the requirement that travel agencies participating in the ARC program pay "a variety of application and other fees." Memorandum of Points and Authorities in Support of Motion for Summary Judgment (Plaintiff's Mem.) at 22–25 (filed Aug. 30, 1985). Specifically, these uniform fees and charges include a $150 annual administrative fee and a $20 requisition fee to cover handling and shipping costs of the blank standard ticket stock ordered from ARC. Second, plaintiff contests the requirement of the Area Settlement Plan that participating agencies pay ARC for their sales on a weekly basis. *Id.* at 9–13.[1]

Currently, the ARC program is a joint venture of 167 airlines. Joint Stipulation (Joint Stip.) at ¶ 6 (filed June 11, 1985). The program structures the airlines' dealings with approximately 19,500 travel agencies in 26,100 travel agency locations. Joint Stip. at ¶ 10. The ARC program has two main functions. *See generally* Joint Stip. at Attachments C–F. The first is an accreditation function. By way of accreditation, ARC requires potential travel agencies to file an application to demonstrate financial stability. Those agencies approved by ARC become recognized travel agents on the Agency List. Although airline members of ARC can technically refuse to deal with agents on the List, as a practical matter a travel agent on the List becomes authorized to deal with all ARC member airlines. The second function, embodied in the Area Settlement Plan, is to regulate accounting and payment between the airlines and the travel agencies. The Area Settlement Plan requires travel agents to report and pay weekly for all sales of airline services. The agent can submit all its transactions on a single list to ARC. ARC then computes the amount due from each agent and the amount owed each airline, and distributes the necessary payments. ARC also monitors the reporting process and imposes sanctions, including removal from the Agency List of agents who do not pay weekly or otherwise fail to comply with the requirements of the ARC program.

The ARC program has been in operation only since the beginning of 1985 and grows out of the recent deregulation of the airline industry. Prior. to ARC, the Air Traffic Conference of America (ATC) operated a travel agency program with the formal approval of the Civil Aeronautics Board (CAB). The formal approval of the CAB afforded the ATC participants immunity from the federal antitrust laws.

During the movement toward deregulation of the airline industry, the CAB evaluated the ATC program in light of its antitrust implications. According to the Board:

Economic regulation by the Board is yielding to competitive discipline by the marketplace. To date, our efforts to direct and effect this transformation have focused primarily on the producers. However, neither the air transportation industry nor the consumers it serves will experience the greatest benefits if competition is limited solely to the air carriers. Therefore we have decided to extend our reappraisal to the marketing of air transportation in the U.S. By this order we are initiating an investigation to determine how competition can best be introduced into the entire marketing system.

---

1. Plaintiff at one point challenged on *per se* grounds the requirement that participating agencies post a surety bond, in an initial amount of $10,000, to be eligible to use ARC ticket stock and to receive and hold monies from the public from the sale of those tickets. *See* Memorandum of Points and Authorities in Support of Preliminary Injunction at 7 (filed

Sept. 21, 1984). It has not, however, specifically challenged defendants' motion for summary judgment on that issue; and its reference to "a variety of application and other fees" charged travel agents, Plaintiff's Mem. at 22, cannot be read to encompass the bonding requirement which is clearly not a "fee."

Joint Stip. at Attachment K, p. 2 (footnote omitted).

The ensuing evaluation was called the *Competitive Marketing Investigation.* The CAB first appointed an administrative law judge (ALJ), who issued a 213–page decision. Joint Stip. at Attachment L. The Board then reviewed the ALJ's decision and issued its own 137–page decision. Joint Stip. at Attachment M. The Board concluded that absent the exclusivity features, which prevented member airlines from independently dealing with travel agencies, the agreements as structured between ATC and travel agents "do not substantially reduce competition." *Id.* at 122. Specifically, the CAB found the accreditation requirement, and the uniform remittance procedures of the Area Settlement Plan, necessary to the program's efficient operation and thus not violative of the antitrust laws. *Id.* at 65–71, 101–104. The Board declined to extend antitrust immunity beyond an initial two-year period, on the grounds that "exposure to antitrust laws is most consistent with an industry controlled by competition." *Id.* at 130. The CAB also noted that the program would not be subject to serious antitrust challenge. *Id.* at pp. 124, 130–32. The Court of Appeals affirmed the Board's decision to terminate antitrust immunity at the end of two years. *Republic Airlines v. Civil Aeronautics Board,* 756 F.2d 1304, 1316–17 (8th Cir. 1985).

After the CAB's decision, ATC began to develop the ARC program to replace the ATC program. Plaintiff in this case opposed formation of the ARC program and, after filing suit in this Court, petitioned the CAB to extend antitrust immunity for an additional six months to give the industry more time to develop a fair program. Plaintiff alleged that the ARC program contained many features found by the CAB to be anticompetitive in its review of the ATC program. It further alleged that the ARC program would:

enable "a relatively small group" of carriers to gain exclusive control over the industry travel agent program, for

no travel agent and no carrier except ATA members will own stock in ARC. Joint Stip. at Attachment O, p. 2. The CAB denied plaintiff's petition, reiterating that "ending antitrust immunity is the best means for keeping the domestic carriers from using their control of travel agents to restrain competition." *Id.* at p. 6.

After formation, ARC submitted its proposed program to the Department of Justice for antitrust clearance pursuant to the Department's Business Review Procedures. 28 C.F.R. § 50.6. The Department approved the planned ARC program. According to the Department's letter, it expected the program to "achieve substantial efficiencies in accreditation, ticket sales and in reporting sales and remitting funds." Joint Stip. at Attachment I, p. 6. The Department "evaluated the[ ] restraints under a rule of reason analysis and ... concluded that the restraints notwithstanding, the overall purpose and effect of the ARC plan is to enhance efficiency in the distribution of airline retailing services." *Id.*

## II.

### A.

In support of its motion, plaintiff argues that the uniform fees and charges used to offset the cost of ARC are anticompetitive, since "[i]n the absence of ARC, ... the allocation of costs associated with the purchase of ticket sales services by the carriers would be determined in the price paid by carriers individually and competitively for such services." Plaintiff's Mem. at 22–23. Plaintiff contends that the collective establishment of fees and charges by ARC allows the airline members to shift costs from themselves to travel agents. This cost-shifting, argues plaintiff, was rejected by the CAB in the airlines' regulated era. *See ATC Application and Agency Fees,* Docket No. 20650, 63 C.A.B. 681, 682 (1973). Now, plaintiff contends, the airlines "are clearly using their collective economic power to distort market allocations of the price they would competitively pay for agent services." Plaintiff's Mem. at 24.

The bulk of plaintiff's argument focuses on the collective establishment of uniform payment terms by ARC. These terms include a requirement that agents file a weekly reports of sales, and give ARC authority to draw drafts on agents' accounts for the amounts due from them. Plaintiff also contests ARC's enforcement scheme, which can ultimately result in removal of a noncomplying agent from the Agency List. Plaintiff argues that such a concerted refusal to deal by the airlines is *per se* unlawful. Plaintiff's Mem. at 10 n. 11.

Plaintiff contends that the two functions of the reporting plan—accounting and payment—are severable. Plaintiff does not dispute the efficiencies of the centralized accounting system provided by ARC. It argues, however, that:

> Defendants have gone far beyond merely establishing a centralized clearinghouse to process documents, perform accounting functions, and determine amounts due. Defendant's [sic] have determined when and how amounts due are to be paid.

Plaintiff's Mem. at 11 (footnote omitted). Plaintiff argues that the collective establishment of time and terms of payment, as distinguished from the accounting function, constitutes price fixing. It maintains that the effect of the ARC arrangement is to collectively establish credit terms. Plaintiff cites *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) for the proposition that a horizontal agreement among competitors to fix the time of payment is price fixing and *per se* illegal. According to plaintiff:

> [T]he commission level is only one element of the price they [the airlines] pay for travel agency services. The allocation of cash flow i.e., who gets the use of customer money for any period of time is also an important element of the price which Defendants pay for travel agent services, and it is that element which they have collectively fixed.

Plaintiff's Mem. at 12.

Plaintiff recognizes that the ARC program allows for a direct form of payment (DFOP) whereby a travel agent receives an accounting from ARC but then pays the airlines directly according to negotiated terms and conditions. It admits that "in theory" such an arrangement would meet plaintiff's concerns, but that:

> [i]n practice ... the collectively fixed seven day remitting cycle has proven so beneficial to the carriers that there is no incentive for them to allow the use of DFOP.

Plaintiff's Mem. at 20.

As to the relevance of the CAB findings and decision, plaintiff points out that the CAB noted its expectation that any future agreements between air carriers and travel agents should comply with the antitrust laws. Plaintiff's Mem. at 3. Plaintiff distinguishes the CAB inquiry for the purpose of determining whether antitrust immunity should be granted, from a decision on the merits that the relationship does not violate the antitrust laws. Moreover, argues plaintiff, the CAB focused on the market for the sale of air transportation, and was primarily concerned with control of travel agent entry into the market. "The CAB," argues plaintiff, "did not focus on Defendant air carriers as a cartel of purchasers fixing an element of the price paid for ticket sales services." Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Plaintiff's Opposition) at 18 (filed Sept. 9, 1985). In any event, argues plaintiff, it is for the court, not a regulatory agency, to determine whether a particular practice violates the antitrust laws.

Plaintiff also disputes the Department of Justice Business Review Letter issued December 26, 1984, which found the ARC program to be procompetitive. It argues that the letter "simply fails to address the price fixing issue." Plaintiff's Mem. at 13. Plaintiff contends:

> DOJ ignores the fact that ARC is a horizontal arrangement among competing airlines purchasing ticket sales services. The business review letter is almost totally void of economic or legal analysis and is contrary to established precedent. At best, the business review letter is an

expression of enforcement policy and not a reasoned legal and economic analysis. Plaintiff's Mem. at 13–14.

### B.

Defendants' motion argues that the legality of the four provisions of the ARC program at issue must be determined under the rule of reason, not *per se* analysis. They argue that a number of principles dictate that *per se* analysis is inappropriate in this case: first, the rule of reason is the prevailing standard of analysis under Section 1 of the Sherman Act; second, *per se* rules are appropriate only for conduct that is manifestly anticompetitive; third, *per se* analysis is not appropriate for restraints with which courts have not had "considerable experience;" finally, *per se* rules are inappropriate for analyzing activities that are integral parts of a potentially efficiency-creating joint venture.

Defendants then apply the four principles listed to the ARC practices at issue. They argue that the ARC provisions are an integral part of a joint venture with "obvious efficiency-creating potential." Statement of Points and Authorities in Support of Defendants' Motion for Summary Judgment on Plaintiff's "Per Se" Claims (Defendants' Mem.) at 33–34 (filed Aug. 30, 1985). Defendants cite *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) where the Supreme Court refused to apply *per se* analysis to the practices of a clearinghouse established by music producers; and *National Collegiate Athletic Assoc. v. Board of Regents (NCAA)*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) where the Supreme Court similarly declined to apply *per se* analysis to the NCAA's plan for televising college football games, noting that "a joint selling arrangement may be so efficient that it will increase sellers' aggregate output and thus be procompetitive." *Id.* at 2961. Defendants argue further that the virtues of the ARC program have been confirmed by the CAB, "the administrative agency with the greatest expertise in the passenger air transportation industry." Defendants'

Mem. at 34. They urge the court to rely on the CAB's findings, with the CAB itself recognizing that its decision should have some precedential effect:

> Especially after lengthy procedures as in this case, we believe that our findings will be given significant deference by a court that may subsequently review the agreement. Admittedly our decision will not prevent subsequent antitrust challenge. However, the reviewing court will have to consider our special expertise in the air transportation industry and find significant error in our findings on an agreements' [sic] likely competitive consequences.

Joint Stip. at Attachment N, p. 7. Finally, defendants maintain that the ARC arrangement is new and unique, and thus a court should hesitate to condemn it as *per se* illegal before there is substantial experience with it.

Defendants next address the specific aspects of the ARC program challenged by plaintiff. As to the annual participation fee and ticket stock handling charge, defendants argue that "courts have consistently recognized that a joint venture 'must be allowed to recoup its costs of operation.'" Defendants' Mem. at 38 (citing *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1369 (5th Cir.1980)). They claim that the ARC provisions are "reasonably ancillary" to the potentially procompetitive effects of the program. *Id.*

Defendants defend the uniform reporting and remitting procedure of the Area Settlement Plan as promoting efficiencies of the ARC program as a whole. In support, they cite the CAB review which approved the provision, and the Justice Department letter, which stated:

> Nor is there reason to suppose that ARC's proposed seven day reporting and settling cycle has either the purpose or will have the effect of restraining competition. These proposed rules should not be viewed in isolation, but rather as part of an overall joint venture that has as a desirable goal the reporting and remit-

ting of funds. The rules are designed to ensure the orderly and secure transmittal of monies from consumers to agents to carriers. They contribute to the efficiency of the ASP by reducing transactions costs for settling and monitoring the continued financial viability of travel agents.

Defendants' Mem. at 42 (citing Joint Stip. at Attachment I, p. 7).

Finally, defendants distinguish *Catalano, supra,* relied upon by the plaintiff. *Catalano* involved an agreement between beer distributors not to extend credit on its sales to retailers. 446 U.S. at 644, 100 S.Ct. at 1926. By contrast, argue defendants, "[t]he principal-agent relationship that exists between air carriers and travel agents is unique." Defendants' Mem. at 41. There is no sale of services by the carriers to the agencies, instead the ASP merely "facilitates the orderly transfer of the funds collected by agents to their principals, the air carriers." *Id.* In addition to the difference between the buyer/seller relationship in *Catalano* and the principal/agent relationship in this case, defendants argue that "unlike the naked agreement in *Catalano* which stood alone and had no conceivable countervailing benefits, the weekly cycle challenged here by plaintiff is an integral part of the Area Settlement Plan." Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment on "Per Se" Claims (Defendants' Opposition) at 14 (filed Sept. 9, 1985).

## III.

### A.

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination ..., or conspiracy, in restraint of trade." 15 U.S.C. § 1. Although the language of Section 1 is broad, it has been read to mean that only *unreasonable* restraints of trade are prohibited. *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Under the rule of reason, a court must engage in a complex inquiry to decide if a particular

restraint, once found to exist, is "unreasonable." According to the Supreme Court in *Board of Trade of the City of Chicago v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918):

[T]he legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

246 U.S. at 238, 38 S.Ct. at 244. Because of the general complexity of antitrust cases, the rule of reason is the "prevailing standard of analysis" under Section 1 of the Sherman Act. *Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *see Smith v. Pro-Football, Inc.,* 593 F.2d 1173, 1181 (D.C.Cir.1978).

Certain types of restraints, however, are so clearly anticompetitive that a full inquiry under the rule of reason is not required. According to the Court in *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958):

[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any

redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often fruitless when undertaken.

356 U.S. at 5, 78 S.Ct. at 518. The *per se* doctrine thus offers a "judicial shortcut" when the practice's "pernicious effect on competition" can be assumed. *Pro-Football, supra,* 593 F.2d at 1181. The classic type of market restraint analyzed under the *per se* doctrine is price fixing among competitors. According to the Supreme Court:

> Congress ... has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination
>
> . . . .
>
> [U]nder the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate ... commerce is illegal *per se.*

*United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221–23, 60 S.Ct. 811, 843–44, 84 L.Ed. 1129 (1940). Thus, "naked restraints" on price cannot be justified. *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). But, because the *per se* doctrine condemns a restraint without any analysis of the factors considered in a rule of reason

inquiry, e.g., market power, effect on competition, efficiency-promoting potential, it must be invoked with caution. As our Court of Appeals has noted:

> Invocation of a *per se* rule always risks sweeping reasonable, pro-competitive activity within a general condemnation, and a court will run this risk only when it can say, on the strength of unambiguous experience, that the challenged action is a "naked restraint[ ] of trade with no purpose except stifling of competition."

*Pro-Football, supra,* 593 F.2d at 1181 (footnotes omitted).

### B.

A fundamental task in an antitrust inquiry is to decide if a challenged practice is so "manifestly anticompetitive" that it should be condemned under *per se* analysis. The cross-motions at issue pose this question. Whereas a finding for plaintiff would dispose of the issue, a finding for defendant means only that the practice at issue is more appropriately analyzed under the rule of reason.

Plaintiff alleges that two ARC program practices are *per se* illegal. These are: (1) the fees charged travel agents by ARC, e.g., a $150 annual fee and a $20 fee for each unit of blank ticket stock purchased; and (2) the uniform payment terms, i.e., a weekly reporting and payment requirement imposed on travel agents by ARC. Plaintiff separates these two types of practices for analysis. This division, however, is artificial. Plaintiff seeks to view the challenged ARC provisions in isolation. But, the fact that the challenged provisions are parts of an overall plan significantly changes antitrust analysis of the restraints. Because of their place in a complex web of arrangements it is not a simple matter for a court to find they "lack ... any redeeming virtue." *Northern Pacific Railway, supra,* 356 U.S. at 5, 78 S.Ct. at 518. Moreover, both the CAB and the Department of Justice have passed judgment on the entire plan, and the particular portions of the plan at issue. The court is not "bound ... by the views of the Department

of Justice" or the CAB. But "while we must independently examine this practice, all those factors should caution us against too easily finding [the practice at issue] subject to *per se* invalidation." *Broadcast Music, supra,* 441 U.S. at 16, 99 S.Ct. at 1561.

In *Broadcast Music,* the Supreme Court faced a situation where composers and publishing houses joined together and set the price for a blanket license sold by their organization. Unlike the ARC program, the joint venture in *Broadcast Music* produced a "different product," which could not be produced by the joint venture members individually. 441 U.S. at 22, 99 S.Ct. at 1563. This fact was significant to the Supreme Court. The Court's inquiry is nevertheless instructive in defining the bounds of *per se* price fixing. In *Broadcast Music* the Court noted:

> [T]his is not a question simply of determining whether two or more potential competitors have literally "fixed" a "price." As generally used in the antitrust field, "price fixing" is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable. The Court of Appeals' literal approach does not alone establish that this particular practice is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming virtue." Literalness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally "price fixing," but they are not *per se* in violation of the Sherman Act.... Thus, it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label *"per se* price fixing." That will often, but not always, be a simple matter.

441 U.S. at 9, 99 S.Ct. at 1557. (citations omitted) (footnote omitted). The Court found that the blanket license was "not a 'naked restrain[t] of trade with no purpose except stifling of competition,' ..., but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use." 441 U.S. at 20, 99 S.Ct. at 1562. (citation omitted). The Court concluded that because:

> the blanket license has provided an acceptable mechanism for at least a large part of the market for the performing rights to copyrighted musical compositions, we cannot agree that it should automatically be declared illegal in all of its many manifestations. Rather, when attacked, it should be subjected to a more discriminating examination under the rule of reason. It may not ultimately survive that attack, but that is not the issue before us today.

441 U.S. at 24, 99 S.Ct. at 1564.

Recently, the Supreme Court again declined to apply *per se* analysis to a joint venture—this time a joint venture that controlled the entire market of college football games available for television coverage. The Court noted that "despite the fact that this case involves restraints on the ability of member institutions to compete in terms of price and output, a fair evaluation of their competitive character requires consideration of the NCAA's justifications for the restraints." *NCAA, supra,* 104 S.Ct. at 2962. As in *Broadcast Music,* the Supreme Court relied upon a specific fact about the particular joint venture in *NCAA* which made *per se* analysis inappropriate. In *NCAA,* the Court found that "what is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.* at 2961. Although in both cases the Supreme Court relied on facts specific to the joint venture before it, its decisions in *Broadcast Music* and *NCAA* provide a more general lesson: where, as here, the redeeming values of the joint venture are readily apparent, the *per se* approach is inappropriate. Significantly, after engaging in a rule of reason analysis the Court reached different results in *Broadcast Music* and *NCAA,* upholding and condemning the restraints, respectively. Important for the purposes now, however, is the fact that neither restraint was found *per se* illegal.

The business arrangement in the ARC program is perhaps most similar to the one present in *Realty Multi-List, supra.* There, licensed real estate brokers united to form Realty Multi-List, Inc. (RML). Its central function was to provide a multiple listing service for its members. At the time the suit was filed, RML "stood alone as the sole multiple listing service in the county." 629 F.2d at 1357. The court noted that "[t]he benefits offered by a multiple listing service are manifest." *Id.* at 1356. In that case, the government challenged various membership restrictions imposed by RML. One requirement was that each member purchase one share of stock, at a price of approximately $1000. The court first noted the limited circumstances in which the *per se* rule should be applied. It then concluded:

> Certainly the antitrust laws must allow reasonably ancillary restraints necessary to accomplish these enormously procompetitive objectives. And restraints of the general types imposed by RML are not subject to out-of-hand condemnation. First, the operation of a multiple listing service is not cost free. While a fee structure could be abused to effectively deter all newcomers from entrance, the service must be allowed to recoup its costs of operation.

*Id.* at 1368–69 (footnote omitted).

Plaintiff cites in its support numerous cases where price fixing has been found *per se* illegal. For example, the case primarily relied upon by plaintiff, *Catalano, supra,* stands for the proposition that an agreement among competitors to limit credit terms can constitute price fixing. 446 U.S. at 648, 100 S.Ct. at 1928. But, in *Catalano,* the restraint was not a part of a complex joint venture with potentially redeeming qualities. The facts in *Catalano* were egregious:

> [R]espondent wholesalers secretly agreed in order to eliminate competition

among themselves, that ... they would sell to retailers only if payment were made in advance or upon delivery.

446 U.S. at 644, 100 S.Ct. at 1926. According to the Court, the agreement involved had "no apparent potentially redeeming value." *Id.* at 649, 100 S.Ct. at 1928. Neither does the recent Supreme Court decision in *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982)[2] dispose of this case. In that case, a number of doctors united to set a maximum price for medical services. The Court condemned this agreement as *per se* price fixing, rejecting plaintiffs' argument that the *per se* rule should be inapplicable because the agreement at issue had potentially procompetitive effects. 457 U.S. at 351, 102 S.Ct. at 2476. But, the doctors in *Maricopa* agreed to set a maximum for the entire price charged. Under the ARC program, airlines are free to negotiate the terms of a travel agent's commission, which constitutes the bulk of the travel agent's remuneration. The fees and payment terms, while affecting price, are not its major component. More importantly, the agreements at issue in both *Maricopa* and *Catalano* involved *only* price terms. Here, the price-related restraints are part of an arguably procompetitive joint venture. The Supreme Court decided *Maricopa* between its decisions in *Broadcast Music* and *NCAA.* The *NCAA* decision confirms that the philosophy of *Broadcast Music* —that a court should decide not just whether a practice is ostensibly "price fixing," but also whether the *per se* approach should logically apply—lives.

As opposed to the bald price fixing agreements condemned in *Catalano* and *Maricopa,* the ARC program in its complexity is more comparable to the joint ventures at issue in *Broadcast Music, NCAA,* and *Realty Multi-List.* The Court in *Broadcast Music* noted that the blanket license developed:

**2.** Defendants never address, and in fact do not acknowledge, the potential relevance of the Supreme Court's decision and language in *Maricopa.*

out of the practical situation in the marketplace: thousands of users, thousands of copyright owners, and millions of compositions.... Individual sales transactions in this industry are quite expensive, as would be individual monitoring and enforcement.

441 U.S. at 20, 99 S.Ct. at 1562. Similarly, the multiple listing service in *Realty Multi-List* aided information flow and reduced transaction costs. As to the ARC program, defendants claim that because it coordinates hundreds of carriers and thousands of travel agents, its efficiency advantages are obvious. *See* Joint Stip. at Attachment I. Moreover, like the restraints at issue in *Realty Multi-List, supra,* they claim the ARC provisions are reasonably ancillary to the joint venture. Specifically, the ARC payment terms, although "fixing" an aspect of price, are claimed to serve the genuine purpose of protecting the airlines which risk nonpayment by travel agencies. Defendants argue that the fees charged travel agents by ARC represent genuine costs of operation, and that the ultimate sanction of removing an agent from the Agency List is necessary to enforce the entire ARC scheme.

Defendants contentions as to the competitive virtues of the ARC program are sufficiently plausible at this stage of the proceedings to preclude summary judgment on a *per se* theory. The ARC program may also well have substantial anticompetitive drawbacks which plaintiff can demonstrate after further discovery or through reference to the recent experience with the program. Nevertheless, it cannot be said that the restraints at issue are so wanting in redeeming virtue as to be *per se* illegal. An Order will grant defendant's cross-motion for summary judgment and deny plaintiff's cross-motion. The Order will also schedule further discovery, a pretrial conference, and trial, without prejudice to renewed summary judgment motions after discovery on the rule of reason issues.