552 So.2d 1241 (1989)
SCHWEGMANN GIANT SUPER MARKETS
v.
Edwin W. EDWARDS, et al.
No. CA 88 1402.
Court of Appeal of Louisiana, First Circuit.
November 14, 1989.
Writ Denied January 26, 1990.
*1242 Michael R. Fontham, New Orleans, for plaintiff-appellant, Schwegmann Giant Super Markets, et al.
Camille Gravel, Jr., Baton Rouge, David Stewart, Washington, D.C., for defendant-appellee, Edwin W. Edwards, et al.
Before COVINGTON, C.J., and WATKINS and SAVOIE, JJ.
COVINGTON, Chief Judge.
Plaintiff, Schwegmann Giant Super Markets, operator of numerous supermarkets and retailer of beer, brought this suit for declaratory judgment and injunctive relief against the Governor, the Secretary of the Department of Revenue and Taxation, the Secretary of the Department of Public Safety and the Assistant Secretary, Office of Alcoholic Beverage Control, to have the court declare La.R.S. 26:741, the "Cash Beer Law", unconstitutional and for a permanent injunction enjoining the defendants from enforcing the law and regulations thereunder.
Plaintiff was joined in the suit by intervenors, Delchamps, Inc., Winn-Dixie Louisiana, Inc., National Tea Co., K & B, Incorporated, and The Great Atlantic & Pacific Tea Company, Inc., each of whom sells beer at retail.
The facts show that Schwegmann Giant Super Markets is a commercial partnership domiciled in the Parish of Orleans, appearing herein through one of its partners, Schwegmann Giant Super Markets, Inc., a Louisiana corporation domiciled in the Parish *1243 of Orleans; Delchamps, Inc. is an Alabama corporation licensed to do business in this State, which has its principal business establishment in the Parish of Orleans; Winn-Dixie Louisiana, Inc. is a Florida corporation licensed to do business in this State, which has its principal business establishment in the Parish of Orleans; National Tea Co. is an Illinois corporation licensed to do business in this State, which has its principal business establishment in the Parish of Orleans; K & B, Incorporated is a Louisiana corporation domiciled in the Parish of Orleans, and The Great Atlantic & Pacific Tea Company, Inc. is a Maryland corporation licensed to do business in this State, which has its principal business establishment in the Parish of Orleans.
Plaintiff and intervenors are business establishments which sell goods and commodities at retail in this State. One of the commodities sold by them is beer. The beer that is retailed by them is purchased from wholesale firms which are licensed by the Office of Alcoholic Beverage Control of the State of Louisiana.
The defendants were at the time of the suit officials of this State who had the responsibility for enforcement of the provisions of the Cash Beer Law, and for establishing regulations pursuant thereto. The defendants were sued individually as well as in their official capacities.
The Cash Beer Law requires plaintiffs and intervenors, who are retailers, as well as all retailers of beer, to pay "cash" at the time of purchase from wholesalers, and requires wholesalers to sell beer to retailers "for cash only."
La. 26:741 provides:
A. All sales of beer and other malt beverages containing more than one-half of one per cent alcohol by volume made by wholesalers to retailers shall be for cash only.
B. The term "cash" as used in this Section means any consideration consisting of currency, or coin, or check, or certified check, or bank money order, in an amount equalling but not exceeding the purchase price of the beer or other malt beverage delivered. The failure to pay cash upon delivery, or any maneuver, device, or shift of any kind, whereby credit is extended, shall constitute a violation of this Section and subject the license of any violator of this Section to suspension or revocation by the commissioner.
C. The term "check" as used in this Section is an order in writing by a retail beer permittee drawn on, and in accordance with the rules of any bank licensed under the laws of this State, or of the United States of America, ordering said bank to pay a certain sum of money to the beer wholesale permittee making the sale, which check is honored by the bank upon presentation.
D. The commissioner shall promulgate rules and regulations defining terms, specifying conditions by which checks and other cash, as defined in Subsections A and B hereof, may be accepted in payment of beer and other malt beverages and establishing procedures and making requirements to be followed by wholesale dealers in attending hearings, depositing checks, filing reports of checks returned unpaid by the bank, and maintaining records. The violation of such regulations when duly promulgated and enacted may be cause for suspension of revocation of the violator's license by the commissioner. Any action of the commissioner under this Section providing for suspension or revocation of a permit shall be preceded by a notice to the violator and hearing by the commissioner or his agent.
Acts 1987, No. 696, § 1.
The statute as written is applicable to both seller (wholesaler) and buyer (retailer).
Executives of the plaintiff and of intervenors explained how they respectively paid cash for purchases of beer from the wholesaler. For all of its stores in the New Orleans area, Schwegmann issues one check each day to each wholesaler, and it pays by money order at its other stores. Delchamps maintains a prepaid account with each wholesaler against which invoices are charged. Winn-Dixie has each of its *1244 stores pay for beer by a "beer draft." National pays with currency. K & B and A & P pay by money orders issued by each retail location.
After hearing all of the evidence and the arguments of counsel, the trial court rendered judgment in favor of the defendants, denying the relief sought by the plaintiff and intervenors, which has been appealed.
On appeal, the appellants assign the following errors:

ASSIGNMENT OF ERRORS
1. The Cash Beer Law directly conflicts with federal law by mandating conduct that is per se illegal under the Sherman Act. Because the State does not actively supervise or pointedly reexamine the need for its competitive policy, the district court should have found that the Cash Beer Law was preempted under the Supremacy Clause of the United States Constitution.
2. The Cash Beer Law bears no rational relationship to any legitimate State objective, and therefore should have been invalidated under the due process and equal protection clauses of the United States and Louisiana Constitutions.
3. The district court should have admitted evidence that the beer wholesalers funded the defense of the Cash Beer Law as relevant to the issues in the case and as affecting the credibility of certain defense witnesses.
First, appellants contend that the Cash Beer Law is inconsistent with the federal anti-trust law (Sherman Act[1]), and it is thus preempted under the Supremacy Clause of the United States Constitution. There is no merit in this contention. It is recognized that state regulatory programs may impose anti-competitive restraints where they bear a rational relationship to a legitimate state objective. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).
In Parker, the Court found in the Sherman Act no purpose to nullify state powers. The Act is directed against "individual and not state action." Under the program challenged in Parker, the State Agricultural Prorate Advisory Commission authorized the organization of local cooperatives to develop marketing policies for the raisin crop. The Advisory Commission had to approve cooperative policies following public hearings. There was extensive official oversight. The state created the machinery for establishing the prorate program; it adopted and enforced the prorate program. The Court said: "But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." 63 S.Ct. at 313.
The Parker Court further observed:
The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit.
63 S.Ct. at 314.
In Hoover v. Ronwin, 466 U.S. 558, 567, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984), the Court stated: "when a state legislature adopts legislation, its actions constitute those of the State ... and ipso facto are exempt from the operation of the antitrust laws." The Court went on to say: "Where the conduct at issue is in fact that of the state legislature ..., we need not address the issues of `clear articulation' and `active supervision.'"
Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), cited by appellants, is inapposite to the case at bar. Catalano was clearly a conspiracy among beer wholesalers to restrain trade in violation of the Sherman *1245 Act. The wholesalers had entered into a "horizontal agreement" to fix credit (which is equivalent to fixing prices). No state legislation or regulation was involved.
The Catalano Court remarked, 100 S.Ct. at 1929:
Thus, under the reasoning of our cases, an agreement among competing wholesalers to refuse to sell unless the retailer makes payment in cash either in advance or upon delivery is `plainly anticompetitive.' Since it is merely one form of price fixing, and since price-fixing agreements have been adjudged to lack any `redeeming virtue,' it is conclusively presumed illegal without further examination under the rule of reason.
The instant case presents no agreement among competing wholesalers. The action involved is solely state action. The legislature has determined that it is in the state's interest to restrict beer sales from wholesalers to retailers to cash transactions. No private economic actor is granted any degree of private regulatory power. See Fisher v. City of Berkeley, California, 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). We find that a horizontal agreement among wholesalers, as in Catalano is quite a different matter from the imposition by statute of cash only for purchases of beer by retailers from wholesalers.
Appellants' reliance upon California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), is also misplaced. In California Retail the state's involvement in the "price-setting program" was insufficient to establish anti-trust immunity under Parker v. Brown. Such is not the case in the instant case. The state plays an active role. The state has total and sole involvement. The wholesalers have no participation or involvement in the determination that beer sales shall be for cash only. In California Retail the wine producer held the power to prevent price competition by dictating the prices charged by the wholesalers. In this case the breweries have no power to dictate that beer sales shall be for cash or for credit. The beer wholesalers have no such power. Such determination is solely state action. Thus, the hybrid restraint condemned in California Retail is quite different from the state restraint imposed by the Cash Beer Law.
We hold on this issue that the Cash Beer Law is shielded from the Sherman Act by the "state action" doctrine of Parker v. Brown. It is plain that the sale of beer for cash only was never intended to operate by force of individual agreement or combination.
We need not consider the other authorities on this issue cited by appellants, since they would require discussion only if this Court had found private economic actors or private parties participating or involved in this state regulatory measure. The evidence in the record of this case establishes no private sector involvement. The evidence does not support appellants' argument that "the Cash Beer Law is designed solely to serve the economic interests of the beer wholesalers." The law serves a valid public interest.
Next, appellants argue that the "Cash Beer Law bears no rational relationship to any State objective, and therefore should have been invalidated under the due process and equal protection clauses of the United States and Louisiana Constitutions."
It is appellants' position on this issue that the "Cash Beer Law seeks only to insulate beer wholesalers from normal business competition. It bears no real and substantial relation to the public welfare, but is preferential legislation for a certain favored group in the beer industry."
United States Supreme Court precedent holds that state statutes are presumed constitutional even in the absence of any express legislative purpose. "Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them." McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802, 809, 89 *1246 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). Hence, the burden is on the party challenging the statute to "negative every conceivable basis which might support it." Madden v. Commonwealth of Kentucky, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940).

DUE PROCESS
Under the Due Process Clauses of both the federal and state constitutions[2], the appellants must overcome the presumption in favor of the validity of the Cash Beer Law. See Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515 (La.1983); Reynolds v. Louisiana Board of Alcoholic Beverage Control, 248 La. 639, 181 So.2d 377 (1965), cert. denied, 385 U.S. 8, 87 S.Ct. 58, 17 L.Ed.2d 7 (1966).
In Theriot, at 520, the Court stated:
The substantive guarantee of due process in the federal and state constitutions requires only that the legislation have a rational relationship to a legitimate state interest.
In Reynolds, supra, the plaintiffs brought a due process challenge to two statutory requirements: (1) that a liquor wholesaler sell to at least 20 per cent of the retailers in its market area, and (2) that more than half of the wholesaler's goods be sold to other retailers and not retained for retail sale by the wholesaler. The Louisiana Supreme Court upheld the statute, observing that it was designed to "stabilize the wholesale liquor business and create within the liquor trade a true class of wholesalers who are economically stable and financially responsible." 181 So.2d at 381 (emphasis in original). The Court added (id. at 382):
It is hardly necessary to state that an economically stable and financially responsible wholesale liquor business ... affects the social, moral, and economic welfare of the public. The provisions of the instant statute if enforced will undoubtedly engender stability and responsibility. Therefore, a definite relationship exists between [the statute] and the purpose for which it was enacted.
See Exxon Corporation v. Governor of Maryland, 437 U.S. 117, 124-25, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978) (due process is not offended by state law excluding gasoline refiners from ownership of service stations, which, "[r]egardless of [its] ultimate economic efficacy ... bears a reasonable relation to the State's legitimate purpose in controlling the gasoline retail market..."). See also New Motor Vehicle Board of California v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978).
The purposes of the Cash Beer Law can better be appreciated in the context of the regulation of alcoholic beverages generally. Alcoholic beverages are treated differently under the law. They are the only commercial product specifically named in the United States Constitution. The State may and does regulate who can buy beer (not minors or intoxicated persons), who can sell beer at the retail level, who can sell beer at the wholesale level, and how close retailers may be located to schools, churches and similar structures. In this context, the Cash Beer Law serves a number of legitimate public goals.
a. Combatting "Tied-House" EvilsIt is apparent that beer suppliers could gain control of retail outlets, and exclude competitors from those outlets. Wholesaler control of retail outlets could also give rise to the "tied-house" evils[3]. See Weisberg v. Taylor, 409 Ill. 384, 100 N.E.2d 748 (1951); National Distributing Company v. United States Treasury Department, 626 F.2d 997 (D.C.Cir.1980). At present, two breweries, Anheuser-Busch and Miller, dominate the beer industry. If the "tied-house" restrictions did not apply and these breweries so desired, they could use credit and other anticompetitive tools to exclude competitors from retail outlets. The Cash Beer Law is reasonably related to the state goal of preventing the "tied-house" evils. See *1247 S.A. Discount Liquor, Inc. v. Texas Alcoholic Beverage Commission, 709 F.2d 291 (5th Cir. 1983) (Texas restriction "prevents companies with monopolistic tendencies from dominating all levels of the alcoholic beverage industry").
b. Controlling Large Retailers' Market PowerThere is also another side to the "tied-house" problem. Larger retailers could use credit as a lever for extracting concessions from wholesalers, thus gaining advantages over smaller retailers through their market power.
c. Wholesaler StabilityWholesalers are more economically stable and financially responsible if they do not need to extend credit. Credit brings with it higher costs and the threat of bad debt losses, both of which could make the wholesale industry less stable. Stability of the beer market was expressly approved in Reynolds, supra, as a proper state goal.
d. Retailer StabilityThe Cash Beer Law prevents retailers from becoming over-extended on credit. Hence it aids the stability to retailers in that they cannot get over-extended on credit purchases of beer. Retailer stability is a proper state goal under Reynolds.

EQUAL PROTECTION
The concept of equal protection of laws is not susceptible to precise definition. There is no easy formula or test applicable; each case must be decided upon its own peculiar circumstances as it arises. See Puget Sound Power & Light Co. v. King County, 264 U.S. 22, 44 S.Ct. 261, 264, 68 L.Ed. 541 (1924). Nevertheless, it is generally accepted that the constitutional guarantee of equal protection dictates that no person or class of persons shall be denied the same protection of laws which is accorded other persons or classes of persons in similar circumstances. See Kentucky Finance Corporation v. Paramount Auto Exchange Corporation, 262 U.S. 544, 43 S.Ct. 636, 67 L.Ed. 1112 (1923).
However, in applying the equal protection guarantee of the United States Constitution, it has been consistently recognized that the Fourteenth Amendment does not deny to the states the power to treat different classes of persons in different ways. See Clements v. Fashing, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). Further, consistent with the equal protection clause, a state may take one step at a time in addressing phases of problems, as long as "the line drawn by the State is rationally supportable." See Geduldig v. Aiello, 417 U.S. 484, 495, 94 S.Ct. 2485, 2491, 41 L.Ed.2d 256 (1974). The court said in Dandridge v. Williams, 397 U.S. 471, 486, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970), the "Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all."
In Minnesota v. Clover Leaf Creamery Company, 449 U.S. 456, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981), the United States Supreme Court severely restricted the grounds on which a statute may be challenged as being underinclusive under the Fourteenth Amendment, as follows:
[A] legislature need not `strike at all evils at the same time or in the same way,' ... and that a legislature `may implement [its] program step by step, ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.' (Citations omitted).
In City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976), the Supreme Court stated:
Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economics under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step by step ... in such economic *1248 areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.... In short, the judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines...; in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. (Citations omitted).
Under federal equal protection analysis, since the statute in question does not concern either a fundamental right or a suspect classification, it may be set aside only if the classification it makes is "based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify [the statute]." See Clements v. Fashing, supra, 102 S.Ct. at 2843.
We find the classification is rational, operating on all retailers and wholesalers of beer alike, and within constitutional requirements. The wholesalers can sell only for cash; the retailers can buy only for cash. It is within the province of the legislature to determine that it does not want anyone engaging in sales of beer to depend on credit for the operation of its business.
We find that, for the foregoing reasons, the Cash Beer Law is rationally related to legitimate state interests. There is no "invidious discrimination" against beer retailers. We hold that the Cash Beer Law is constitutional.
Finally, appellants complain that the trial court erred in refusing to admit evidence that the beer wholesalers funded the defense of the Cash Beer Law. We hold that the trial court properly ruled such evidence inadmissible. It is irrelevant to the supremacy issue or the constitutional issue. Such evidence would have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code of Evidence, Art. 401; Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law, 204 (1989). "Evidence which is not relevant is not admissible." La.Code of Evidence, Art. 402.
For the foregoing reasons, the judgment of the trial court is affirmed at appellants' costs.
AFFIRMED.
SAVOIE, J., agrees with the result.
NOTES
[1] 15 U.S.C. sec. 1 et seq.
[2] U.S. Const. Fifth and Fourteenth Amendments; La.Const. art. I, sec. 2.
[3] "Tied-house" is the imposition by producers or wholesalers of exclusive contracts or agencies upon formerly independent retailers.