**COMPUCREDIT HOLDINGS CORPORATION,**
**Plaintiff,**

v.

**AKANTHOS CAPITAL MANAGEMENT, LLC, et al.,**
**Defendants.**

Civil Action No. 1:11–CV–117–TCB.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 17, 2011.

Christopher W. Madel, K. Craig Wildfang, Randall Tietjen, Robins Kaplan Miller & Ciresi, Minneapolis, MN, Emmet J. Bondurant, II, Jason James Carter, Michael A. Caplan, Bondurant Mixson & Elmore, LLP, Atlanta, GA, for Plaintiff.

Harry N. Niska, Jeff I. Ross, Kelly K. Pierce, Ross & Orenstein, LLC, Minneapolis, MN, Heather Smith Michael, Karen Barris Bragman, Kevin B. Getzendanner, Arnall Golden & Gregory, Atlanta, GA, for Defendant.

### *ORDER*

TIMOTHY C. BATTEN, SR., District Judge.

Before the Court is Defendants' motion for judgment on the pleadings and to strike allegations in the complaint [114]. For the reasons that follow, the Court will grant Defendants' motion for judgment on the pleadings and deny as moot Defendants' motion to strike allegations in the complaint.

## I. Background

### A. The Parties

Defendants are holders of convertible senior notes issued by Plaintiff CompuCredit Holdings Corporation ("CompuCredit") in 2005. The notes were issued pursuant to two indentures, and Defendants collectively own approximately seventy percent of the notes issued pursuant to those indentures. The first series of notes will come due in 2025 and the second series of notes will come due in 2035. The Court will hereinafter refer to them as the "2025 notes" and the "2035 notes," respectively.

### B. Related Litigation

This case involves two related lawsuits between the same parties. In the first lawsuit, Defendants sued CompuCredit in the District of Minnesota alleging, *inter alia*, that CompuCredit was in violation of the Uniform Fraudulent Transfer Act ("UFTA") because CompuCredit was about to issue a massive dividend even though it was in severe financial distress. Thus, Defendants alleged that CompuCredit had "embarked on a deliberate strategy of stripping itself of assets, distributing those assets to insiders, and disabling itself from meeting its obligations to its creditors."

On March 24, 2010, the first lawsuit was transferred to this Court for the convenience of the parties. The case was docketed as 1:10–cv–844–TCB, and the Court will hereinafter refer to it as the "UFTA litigation."

The present action is the second lawsuit between these parties, and it was filed in the District of Minnesota only a few weeks after the UFTA litigation was transferred to this Court. In this case, CompuCredit has sued Defendants alleging that they have violated the Sherman Act by conspir-

ing to inflate the prices of CompuCredit notes.

On January 18, 2011, the present action was also transferred to this Court in an effort to avoid duplicitous litigation in separate districts. The case has been docketed as 1:11–cv–117–TCB, and the Court will hereinafter refer to it as the "antitrust litigation."

While the antitrust litigation was still pending in the District of Minnesota, Defendants moved for judgment on the pleadings and for sanctions under Rule 11. After the case was transferred to this Court, Defendants were granted leave to file updated versions of those motions. The Court now considers Defendants' renewed motion for judgment on the pleadings [114]. The Court will reserve ruling on Defendants' renewed motion for sanctions under Rule 11 [115].

### C. Factual Background [1]

In December 2009, CompuCredit announced a plan to issue a $25 million dividend to its stockholders. In addition, CompuCredit announced that it was considering a tax-free spinoff of its microloan businesses. Defendants immediately complained about the dividend and the spinoff and demanded that CompuCredit retract its plan to issue the dividend.

Shortly thereafter, Defendants initiated the UFTA litigation, even though CompuCredit had never missed an interest payment on the notes at issue. In their UFTA complaint, Defendants sought to prevent the planned dividend and contemplated spinoff through a preliminary injunction, but they did not seek to compel CompuCredit to repurchase their notes. In support of their request for relief, Defendants alleged that CompuCredit was

---

1. For purposes of this motion, the factual allegations in the complaint are taken as true. Thus, the Court's rendition of the facts reflects the facts set forth in the complaint.

insolvent, even though CompuCredit had twice reported equity in excess of $200 million during the previous year. The district judge denied Defendants' request for a preliminary injunction, finding that CompuCredit was not insolvent, despite expert testimony that the company was insolvent on a pro-forma basis. After the preliminary injunction was denied, CompuCredit issued its planned dividend. Defendants then filed an amended complaint, still seeking to enjoin the contemplated spinoff, but now seeking damages related to the dividend.

On January 28, 2010, after issuing the dividend, CompuCredit made an offer to repurchase up to $160 million of its outstanding notes at prices purportedly equal to or above market value. As a result of the tender offer, CompuCredit was able to repurchase approximately eleven percent of its outstanding 2025 notes at fifty percent of face value and approximately ten percent of its outstanding 2035 notes at thirty-five percent of face value. None of Defendants participated in the tender offer, and one of them later indicated that Defendants had agreed not to participate because they believed the price to be too low. CompuCredit contends, however, that the parties who participated in the tender offer were sophisticated and had knowledge of the fair value of CompuCredit notes.

On January 27, 2010, counsel for Defendants sent a letter to CompuCredit's auditor stating that CompuCredit's ability to continue as a going concern was subject to "substantial doubt." Attached to the letter was the report of Defendants' expert, who had concluded that CompuCredit was pro-forma insolvent. Then, in early February, Defendants wrote a letter to the SEC claiming that CompuCredit was "already insolvent." The letter did not inform the SEC of the district court's contrary finding. Finally, in March, Defendants wrote the indenture trustee claiming that CompuCredit had violated the indentures, despite the fact that they had made no such claim in court. According to CompuCredit, all of these communications worked against Defendants' economic self-interest. Thus, CompuCredit contends that they must have been for the purpose of coercing CompuCredit to settle the UFTA litigation and repurchase Defendants' notes at inflated prices.

Prior to the pretrial conference in the UFTA litigation, Defendants demanded that CompuCredit repurchase all of their notes at par. At that time, CompuCredit claims that the 2025 notes were trading at approximately 53.5 percent of par and the 2035 notes were trading at approximately thirty-seven percent of par. A representative of one of the defendants later indicated that Defendants would only accept sixty-five to seventy percent of par for their notes.

Since they commenced the UFTA litigation, Defendants have increased their aggregate holdings of CompuCredit notes. CompuCredit contends that Defendants have done so as a part of their conspiracy to artificially inflate the prices of CompuCredit notes. CompuCredit also argues that Defendants' purchase of additional CompuCredit notes indicates that the UFTA litigation was intended solely to coerce CompuCredit into repurchasing its notes at inflated prices and was not a legitimate attempt to obtain judicial relief.

CompuCredit now alleges that Defendants' collective actions from December 2009 forward amount to a violation of Section 1 of the Sherman Act. Based on a market that consists solely of CompuCredit notes, both counts allege that Defendants have unreasonably restrained trade by "inflating the price at which CompuCredit can extinguish its debt by purchasing these Notes." CompuCredit further

alleges that Defendants have market power and that CompuCredit notes are unique and cannot be purchased from any other source.

In support of Count I of the Complaint CompuCredit points to the following activity as anticompetitive: (1) Defendants' joint demand that CompuCredit repurchase their notes at par; (2) Defendants' communications with CompuCredit's auditor, the SEC and the indenture trustee regarding CompuCredit's financial condition; (3) Defendants' purchases of CompuCredit notes after initiating the UFTA litigation; (4) Defendants' agreement to boycott the January 28, 2010 tender offer; and (5) Defendants' commencement of the UFTA litigation, which CompuCredit characterizes as a "sham."

Count II of the complaint omits references to the UFTA litigation and the SEC letter and instead relies on (1) Defendants' joint demand that CompuCredit repurchase their notes at par; (2) Defendants' communications with CompuCredit's auditor and the indenture trustee regarding CompuCredit's financial condition; (3) Defendants' purchases of CompuCredit notes after initiating the UFTA litigation; and (4) Defendants' agreement to boycott the January 28, 2010 tender offer.

As a result of Defendants' actions, CompuCredit seeks (1) a declaratory judgment that Defendants have violated the Sherman Act, and (2) an order requiring Defendants to tender all of their notes to CompuCredit at the prices paid in the January 28, 2010 tender offer. In the alternative to such an order, CompuCredit seeks to enjoin Defendants from taking any coordinated action concerning the price of CompuCredit notes or communicating with each other or third parties regarding CompuCredit's financial condition or breach of any indenture.

## II. Discussion

### A. Legal Standard

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). Judgment pursuant to Rule 12(c) is appropriate "when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings." *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir.2002). "A motion for judgment on the pleadings is subject to the same standard as a Rule 12(b)(6) motion to dismiss." *Roma Outdoor Creations, Inc. v. City of Cumming*, 558 F.Supp.2d 1283, 1284 (N.D.Ga.2008).

When deciding a motion for judgment on the pleadings, the court accepts factual allegations in the complaint as true and construes all reasonable factual inferences in the plaintiff's favor. *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1273 (11th Cir.2008). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994); *accord Lewis v. Brautigam*, 227 F.2d 124, 127 (5th Cir. 1955). To survive a motion for judgment on the pleadings, a complaint must convey factual allegations that amount to "more than labels and conclusions" and "raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

### B. Analysis

Defendants argue that they are entitled to judgment on the pleadings because "the Sherman Act does not prohibit creditors from acting jointly to protect their rights or negotiating jointly to compromise with a

debtor." In support of that proposition, Defendants assert that they have found no case "in which a debtor was allowed to sue its creditors under the Sherman Act because those creditors were 'conspiring' in negotiations to compromise the debtor's debts." Relying on *United Airlines, Inc. v. U.S. Bank, N.A.,* 406 F.3d 918, 924–25 (7th Cir.2005), and *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1052 (2d Cir.1982), Defendants contend that "where antitrust claims have been asserted regarding joint creditor negotiations, they have been rejected."

In response, CompuCredit points to two Supreme Court decisions in which the Sherman Act was applied to creditors: *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), and *Fortner Enter., Inc. v. U.S. Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). CompuCredit argues that these cases stand for the proposition that a debtor may bring an antitrust claim against its creditors, and as a result, the collusive action alleged in its complaint should give rise to a claim under the Sherman Act. CompuCredit further argues that the cases Defendants cite are all distinguishable because CompuCredit has not breached the terms of its indentures, CompuCredit is not in bankruptcy, and Defendants are individual note holders rather than indenture trustees.

The Court is convinced that the collusive activity alleged in CompuCredit's complaint does not violate the Sherman Act. All of the cases on which CompuCredit relies involved creditors who agreed about whether or on what terms to extend credit in the future. While *Catalano* and *Fortner* may stand for the general proposition that debtors are sometimes permitted to bring antitrust claims against creditors, neither case involved creditors who acted collectively to maximize their ability to collect on an outstanding debt.

In *Catalano,* beer wholesalers agreed that they would no longer extend short-term credit to beer retailers. This violated the Sherman Act because it was tantamount to an agreement to eliminate competitive discounts from future contracts. 446 U.S. at 648, 100 S.Ct. 1925. In *Fortner,* a lender conditioned its loans on the borrower using loan proceeds to purchase a prefabricated home from the lender's parent corporation. This conduct fell within the purview of the Sherman Act because it constituted a tying agreement with respect to future loan contracts. 394 U.S. at 509, 89 S.Ct. 1252. Thus, both *Catalano* and *Fortner* involved agreements about whether or on what terms to extend *future* credit, rather than agreements designed to maximize the amount collected on *existing* debts. As a result, they are inapposite to the present case.

Although there are few cases that address the present situation of creditors acting collectively to collect outstanding debt, both the Second and Seventh Circuits have rejected antitrust claims in that circumstance, and the Court finds the reasoning of those opinions persuasive.

The Seventh Circuit has recognized that "[c]ompetition comes at the time loans are made," and "cooperation in an effort to collect as much as possible of the amounts due under competitively determined contracts is not the sort of activity with which the antitrust laws are concerned." *United Airlines,* 406 F.3d at 921. In *United Airlines,* about 175 of United's planes were subject to financing leases when United filed bankruptcy in 2002. Initially, the aircraft lessors agreed to accept discounted rental payments, but as the bankruptcy proceeded, three of the lessors demanded that United either cure its defaults and resume full payments or return their aircraft. United responded by bringing an antitrust action against the lessors, argu-

ing that they violated the Sherman Act by coordinating their efforts to preserve their collateral and collect the promised payments. The Seventh Circuit rejected this claim as "thin to the point of invisibility" and held that "[n]egotiating discounts on products already sold at competitive prices is not a form of monopolization." *Id.* at 924–25.

The Second Circuit has gone even further, characterizing a debtor's antitrust claims against jointly negotiating creditors as "border[ing] on the frivolous," *Sharon Steel,* 691 F.2d at 1052–53, and this Court shares that sentiment. In *Sharon Steel,* a debtor corporation announced its plan to liquidate its assets and make an initial distribution to its common stockholders. In response, a group of indenture trustees demanded that the corporation redeem the debentures it had issued within thirty days or establish a trust fund to secure the debt. At least one of the indenture trustees also threatened to sue to enjoin the liquidating distribution. Although the parties were initially able to reach a compromise, the indenture trustees later sued to redeem the debentures. Sharon Steel, a company that had assumed the liabilities of the original debtor, responded by bringing an antitrust action against the indenture trustees, arguing that they had violated the Sherman Act by conspiring to force the original debtor and Sharon Steel to redeem the debentures.

Despite the collective actions taken by the indenture trustees in *Sharon Steel,* the Second Circuit rejected the antitrust claims. In doing so, the court recognized that joint activity by creditors facing a debtor is not harmful to consumers, because "by reducing both losses to creditors and the transaction costs resulting from bankruptcy, such activity reduces the costs of borrowing and the costs of doing business, all of which is to the consumer's advantage." *Id.* at 1052. As a result, the concerted activity of the indenture trustees in *Sharon Steel* had no "anti-competitive purpose or effect injurious to consumer welfare" and could not give rise to an antitrust claim under the Sherman Act. *Id.*

The present case falls squarely within the principles articulated in *United Airlines* and *Sharon Steel.* Both counts of CompuCredit's complaint allege that Defendants' collective activity has unreasonably restrained trade because it has "the effect of inflating the price at which CompuCredit can extinguish its debt by purchasing these Notes." In effect, CompuCredit alleges that Defendants have co-operated for the same purpose as the lessors in *United Airlines,* that is, "in an effort to collect as much as possible of the amounts due under competitively determined contracts." 406 F.3d at 921. This type of collective action, as *United Airlines* recognized, "is not the sort of activity with which the antitrust laws are concerned." *Id.* Moreover, as *Sharon Steel,* 691 F.2d at 1052, acknowledged, this type of collective activity has the effect of reducing the cost of borrowing and actually benefitting consumers.

Although CompuCredit points out several factual differences between *United Airlines, Sharon Steel* and the present case, it fails to explain how those differences are of consequence, and the Court finds that they have no bearing on the applicability of the Sherman Act. First, CompuCredit argues that this case is different because CompuCredit has not defaulted on its note obligations. However, in *Sharon Steel,* 691 F.2d at 1046 n. 11, the indenture trustees took collective action prior to any default. Moreover, the nonoccurrence of a default merely makes Defendants' conduct "cooperation in an effort to collect as much as possible of the amounts due under competitively determined contracts." *United Airlines,* 406 F.3d at 921.

Second, CompuCredit argues that this case can be distinguished from *United Airlines* and *Sharon Steel* because Compu-Credit has not declared bankruptcy. Contrary to CompuCredit's assertion, however, the debtor in *Sharon Steel*, 691 F.2d at 1052, was not insolvent. Moreover, while *United Airlines*, 406 F.3d at 921, noted that coordination among lenders is especially common in bankruptcy, it gave no indication that similar activity outside the bankruptcy context would somehow be transformed into an anticompetitive conspiracy.

Finally, CompuCredit argues that *United Airlines* and *Sharon Steel* are distinguishable because the conspiring parties in those cases were indenture trustees rather than individual note holders. While CompuCredit fails to articulate the significance of this distinction, it presumably relates to the authority of indenture trustees to represent the collective interests of investors under the Trust Indenture Act ("TIA"). Although the TIA created indenture trustees "precisely because individual lenders may be too diffuse to protect their own interests," *United Airlines*, 406 F.3d at 921, there is no reason to believe that investors should be subjected to antitrust claims merely because they choose to act independent of their indenture trustees.

Consequently, accepting the factual allegations in the complaint as true and construing all reasonable factual inferences in the CompuCredit's favor, the Court finds that the Sherman Act is not implicated by Defendants' conduct. As a result, it is unnecessary for the Court to reach Defendants' remaining arguments. The Court will grant Defendants' motion for judgment on the pleadings, and as a result, Defendants' motion to strike certain portions of the complaint is moot.

**III.   Conclusion**

Defendants' Motion for Judgment on the Pleadings and to Strike Allegations in Plaintiff's Complaint [114] is GRANTED IN PART and DENIED IN PART. Defendants' motion for judgment on the pleadings is GRANTED. Defendants' motion to strike allegations in the complaint is DENIED as moot. The Clerk is DIRECTED to close the case. The Court retains jurisdiction, however, for the purpose of determining whether CompuCredit and its counsel should be sanctioned under Rule 11, and if so, to what extent.