[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-13467

_____

D.C. Docket No. 1:10-cv-00844-TCB


AKANTHOS CAPITAL MANAGEMENT, LLC,
CNH CA MASTER ACCOUNT, L.P., et al.,

Plaintiffs–Appellees,

versus


ATLANTICUS HOLDINGS CORPORATION,

Defendant–Appellant.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 28, 2013)

Before PRYOR and BLACK, Circuit Judges, and RESTANI,[*] Judge.

PER CURIAM:

---

[*] Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

This appeal presents an issue that has already been fully litigated, and res judicata bars relitigation of that issue. The antitrust counterclaim of Atlanticus Holdings Corporation, formerly CompuCredit, against Akanthos Capital Management and twenty other hedge funds is identical to the complaint of Atlanticus in another antitrust lawsuit between the same parties. The district court dismissed the complaint in the other lawsuit, and we affirmed that dismissal by an equally divided vote of the en banc Court. CompuCredit Holdings Corp. v. Akanthos Capital Mgmt., LLC, 916 F. Supp. 2d 1326, 1329–32 (N.D. Ga. 2011), aff'd, 698 F.3d 1348, 1349 (11th Cir. 2012) (en banc). The district court dismissed the counterclaim in this action for the same reason that it dismissed the complaint in the other one. When the other lawsuit was pending before the en banc Court, Atlanticus moved to consolidate the appeals in the two actions because they presented an identical issue, but we denied that motion and instead stayed this appeal. But Atlanticus was correct about the identical nature of these actions, and res judicata bars Atlanticus from relitigating this matter. We affirm the dismissal of the counterclaims of Atlanticus, but we deny the motion for fees and costs filed by the hedge funds.

## I. BACKGROUND

Deciding this appeal demands a review of the procedural history of not only this lawsuit, but the other lawsuit that our en banc Court decided earlier. This

2

lawsuit began when the hedge funds, as noteholders, sued Atlanticus in 2009 to enjoin an allegedly fraudulent transfer. Atlanticus then filed its own lawsuit against the noteholders in which it alleged that the noteholders had violated section 1 of the Sherman Act when they filed this allegedly "sham" lawsuit, boycotted the company's tender offer, and engaged in price fixing. Both lawsuits were transferred to the district court and assigned to the same judge. In an interlocutory appeal, we ordered the district court to dismiss the complaint filed by the noteholders. Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp., 677 F.3d 1286, 1298 (11th Cir. 2012). Our decision would have ended this lawsuit except that, while the interlocutory appeal was pending, Atlanticus answered the noteholders' complaint and incorporated by reference the complaint from its lawsuit against the noteholders. The district court construed this pleading as a counterclaim under Federal Rule of Civil Procedure 8(c). The noteholders moved to dismiss the counterclaim on the ground that Atlanticus was attempting to obtain discovery that the district court had denied in its other lawsuit against the noteholders. The noteholders did not mention the doctrine of res judicata as the antitrust claim had not yet been adjudicated, but they acknowledged the parallel litigation in their motion to dismiss.

The district court then dismissed both the antitrust complaint and the antitrust counterclaim filed by Atlanticus in the separate actions. On June 16,

3

2011, the district court judge issued a minute entry stating, "The Court will be issuing an order dismissing the Anti-Trust claim." On the same day, the noteholders filed a reply in support of their motion to dismiss the counterclaim. In their reply, they acknowledged the minute entry and urged the district court to dismiss the counterclaim because the antitrust claim was identical. On June 17, 2011, the district court dismissed the antitrust lawsuit filed by Atlanticus. CompuCredit Holdings Corp. v. Akanthos Capital Mgmt., LLC, 916 F. Supp. 2d 1326, 1329–32 (N.D. Ga. 2011). On November 8, 2011, the district court dismissed the antitrust counterclaim in this lawsuit.

Atlanticus appealed the dismissal of its antitrust lawsuit against the noteholders. A panel of this Court affirmed the dismissal of the antitrust lawsuit, CompuCredit Holdings Corp. v. Akanthos Capital Mgmt., LLC, 661 F.3d 1312, 1315 (11th Cir. 2011), but we later vacated that decision and granted a rehearing en banc. CompuCredit Holdings Corp. v. Akanthos Capital Mgmt., LLC, 677 F.3d 1042, 1043 (11th Cir. 2012). After we granted the rehearing en banc, Atlanticus filed a notice of appeal in this action to appeal the dismissal of its counterclaim.

Atlanticus moved to consolidate the en banc appeal and this appeal because "[t]he sole issue" in both appeals was "identical." The noteholders did not oppose the motion to consolidate the appeals. We denied the motion and stayed this appeal pending the en banc decision.

Sitting en banc, we affirmed the dismissal of the antitrust complaint against the noteholders.  CompuCredit Holdings Corp. v. Akanthos Capital Mgmt., LLC, 698 F.3d 1348, 1349 (11th Cir. 2012) (en banc).  We affirmed without an opinion because the en banc court was evenly divided.  Id.; see United States v. Geders, 585 F.2d 1303, 1305–06 (5th Cir. 1978) (en banc).  After the en banc ruling, we ordered the parties to submit briefs for this appeal, and one month later, the noteholders moved to dismiss this appeal based on res judicata.

## II. STANDARD OF REVIEW

We review a motion to dismiss for failure to state a claim de novo.  Timson v. Sampson, 518 F.3d 870, 872 (11th Cir. 2008).  We may affirm a judgment based on any grounds supported by the record.  Molinos Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1349 n.20 (11th Cir. 2011).

## III. DISCUSSION

We divide our discussion in two parts.  First, we explain that res judicata bars Atlanticus from pursuing this appeal.  Second, we deny the noteholders' motion for fees and costs under Federal Rule of Appellate Procedure 38.

### A. Res Judicata Bars this Action.

Res judicata bars Atlanticus from obtaining relief in this action. Atlanticus litigated the identical complaint against the same parties in another action, and this Court affirmed the dismissal of that complaint.  See CompuCredit Holdings Corp.,

5

698 F.3d at 1349.  When a judgment is rendered for the defendant, the plaintiff's claim is extinguished; res judicata bars the plaintiff from relitigating that same claim against the same defendant.  See Jaffree v. Wallace, 837 F.2d 1461, 1466–67 (11th Cir. 1988) (stating that finality for purposes of res judicata is when the district court issues its judgment); see also 18 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4402 (2d ed. 2002).

Atlanticus argues that the noteholders waived their defense of res judicata, but we disagree.  Although a party can waive its defense of res judicata if it fails to plead the defense, 18 Wright & Miller, supra, at § 4405, the noteholders raised the defense at the earliest opportunity.  The antitrust lawsuit continued until June 20, 2011, when the district court entered its judgment on the pleadings.  Five months passed between that judgment and the dismissal of the counterclaim in this action, but on June 16, 2011, immediately after the noteholders learned that the district court intended to dismiss the other lawsuit, the noteholders filed a reply in support of their motion to dismiss the counterclaim in this lawsuit.  Their reply did not include the magic words "res judicata," but it clearly stated that, because the district court planned to dismiss the antitrust lawsuit, it must necessarily dismiss the counterclaim in this lawsuit too.  As soon as the en banc court affirmed the dismissal of the other lawsuit and the stay was lifted in this appeal, the noteholders

raised the defense of <u>res judicata</u>.  Given these overlapping events, the noteholders did not waive their defense of <u>res judicata</u>.

Even if the noteholders had not raised their defense of <u>res judicata</u>, we would <u>sua sponte</u> raise the issue.  <u>See, e.g.</u>, <u>Shurick v. Boeing Co.</u>, 623 F.3d 1114, 1116 & n.2 (11th Cir. 2010).  No prejudice results from our dismissal of this appeal because Atlanticus has already fully and fairly litigated the identical complaint.  And if the Court were to fail to raise the issue of <u>res judicata</u>, then we would threaten the public interest in avoiding judicial waste and inconsistent judgments.  <u>See</u> <u>Arizona v. California</u>, 530 U.S. 392, 412–13, 120 S. Ct. 2304, 2318 (2000) ("This result is fully consistent with the policies underlying res judicata: it is not based solely on the defendant's interest in avoiding the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste." (internal quotation marks omitted) (quoting <u>United States v. Sioux Nation of Indians</u>, 448 U.S. 371, 432, 100 S. Ct. 2716, 2749 (1980) (Rehnquist, J., dissenting))); <u>see also</u> <u>Gilbert v. Ferry</u>, 413 F.3d 578, 579–80 (6th Cir. 2005); <u>Clements v. Airport Auth. of Washoe Cnty.</u>, 69 F.3d 321, 329–30 (9th Cir. 1995).

*B. We Deny the Noteholders' Motion for Fees and Costs.*

We reject the noteholders' request that we award fees and costs under Federal Rule of Appellate Procedure 38, which provides that "[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed

7

motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." Fed. R. App. P. 38. In this appeal, Atlanticus attempted to consolidate the appeals, but we denied its motion. Perhaps Atlanticus should have voluntarily dismissed its appeal after the en banc Court ruled, but its failure to do so in this circumstance should not subject it to paying fees and costs under Rule 38.

## IV. CONCLUSION

We **AFFIRM** the dismissal of the antitrust counterclaim on the ground that it is barred by <u>res judicata</u>. We **DENY** the noteholders' motion to dismiss this appeal as moot and **DENY** the noteholders' motion for fees and costs.

8

PRYOR, Circuit Judge, concurring specially:

I join fully in the opinion of the majority.  I write separately to explain why the novel antitrust counterclaim that Atlanticus filed in this action fails as a matter of law.  I served on both the panel that affirmed the dismissal of the complaint that Atlanticus filed in the other lawsuit and the en banc Court that affirmed the dismissal by an equally divided vote.  My perspective on this issue has not changed.  When noteholders negotiate collectively with the issuer of debt, their collective activity is not per se illegal because it is procompetitive.  Coordination among existing creditors "is commonly in the interests of all parties." Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1052 (2d Cir. 1982).

## I. BACKGROUND

In 2005 CompuCredit, now Atlanticus Holdings Corporation, issued two series of convertible senior notes.  One series matures in 2025 and the other in 2035, and holders of the 2025 notes had a put option to require Atlanticus to repurchase some or all of their notes in 2012.  Twenty-one hedge funds individually purchased the notes on the secondary market.  When this dispute began, these noteholders owned a combined share of roughly 70 percent of the notes.

This dispute began in 2009 when Atlanticus announced a $25 million dividend and a tentative plan to spin off the company's profitable microloan

9

business.  The noteholders sued to enjoin the dividend and any proposed spin-off on the ground that those actions would constitute fraudulent transfers by rendering Atlanticus insolvent.  The district court denied the noteholders' motion for a preliminary injunction, and Atlanticus issued the dividend.

After it issued the dividend, Atlanticus made a tender offer to repurchase some of its notes before the notes matured.  The company offered to purchase up to $160 million in face value of the notes at a price they stated was "equal to, or slightly above, then-existing market prices."  Some accepted the offer, but the noteholders in this appeal chose not to tender their notes.

As this matter proceeded in the district court, the noteholders collectively offered to sell back the notes at par value, an amount in excess of the price at which the notes were trading on the secondary market.  The noteholders later stated that they would have been willing to negotiate a lower price between 65 and 70 percent of par value and that their offer was an attempt to settle this lawsuit.

Atlanticus alleges that the noteholders committed a per se violation of the Sherman Act, 15 U.S.C. § 1, when they engaged in a conspiracy to force the company to repurchase its notes at inflated prices.  Atlanticus argues that the noteholders' rejection of its tender offer was a "group boycott" and that the noteholders' joint offer to sell the notes was "price fixing."  Atlanticus also argues that this lawsuit was a sham and part of the conspiracy to force the company to buy

back its notes.  Atlanticus argues that, after initiating this matter, the noteholders purchased more notes and that these later purchases prove this lawsuit was a sham. Finally, Atlanticus alleges that the noteholders communicated with the company's auditor, the Securities and Exchange Commission, and the indenture trustee about the failing financial condition of the company.  Atlanticus argues that these communications could only have been for the purpose of furthering the noteholders' conspiracy.

## II. DISCUSSION

It was not per se illegal for the noteholders collectively to renegotiate the debt they owned.  The noteholders' activity was neither price fixing nor a group boycott.  Both the tender offer in January 2010 and the noteholders' offer in March 2010 were attempts to secure the debt that the noteholders already owned.  These negotiations are procompetitive and cannot constitute a per se violation of the Sherman Act.

A per se violation of the Sherman Act is so "plainly anticompetitive" and "so often lack[s] any redeeming virtue" that it is "conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases."  Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 7–8, 99 S. Ct. 1551, 1556 (1979).  The Supreme Court has explained that most price fixing agreements are per se illegal, but the Court has cautioned that defining a per se

11

price fixing conspiracy is "not a question simply of determining whether two or more potential competitors have literally 'fixed' a 'price.'" Id. at 8–9, 99 S. Ct. at 1556–57. For example, a law firm literally engages in market division and "price fixing" when it brings together lawyers and sets the price of each lawyer's services. The firm is not "plainly anticompetitive" and without "redeeming virtue," but instead offers the services of its attorneys in a more efficient way. See Robert H. Bork, The Antitrust Paradox: A Policy at War with Itself 265 (1978); see also Broad. Music, 441 U.S. at 9, 99 S. Ct. at 1557.

The group efforts of the noteholders were not per se illegal because they were neither "plainly anticompetitive" nor "lack[ing] any redeeming virtue," Broad. Music, 441 U.S. at 7–8, 99 S. Ct. at 1556. Our sister circuits have already acknowledged the procompetitive nature of collective action by creditors to secure outstanding debt. See United Airlines, Inc. v. U.S. Bank N.A., 406 F.3d 918, 921 (7th Cir. 2005); Sharon Steel, 691 F.2d at 1052. I agree with their reasoning.

Atlanticus attempts to distinguish the decisions of our sister circuits on the ground that its notes are actively traded on the secondary market, but that argument fails for two reasons. First, this controversy involved only the noteholders and the issuer of the notes. As between these parties, the notes were not for sale on the secondary market; they were in the hands of the noteholders. The noteholders had already competed against one another in the secondary market when they

12

purchased the notes, United Airlines, 406 F.3d at 921, and they need not continue to compete against one another to ensure that the debt they purchased will be repaid. Second, the group of noteholders did not distort the secondary market because they did not act exclusively as a group; any individual noteholder could leave the group and individually resell its debt to Atlanticus or sell it on the secondary market.

### A. The Noteholders Are in a Preexisting Creditor-Debtor Relationship with Atlanticus.

Atlanticus argues that the noteholders were not legally entitled to sell their notes at a certain price and that the district court conflated the legal relationship between buyers and sellers of unmatured notes with the legal relationship between debtors and creditors of matured notes, but that argument fails. The allegedly anticompetitive activity in this appeal involved negotiating with the debt issuer, not buyers on the secondary market. In its brief, Atlanticus attempts to construe itself as a player in the secondary market as follows: "[T]he alleged conspiracy . . . was about the price at which admitted horizontal competitors would sell their notes on a competitive secondary market [in which] CompuCredit participated as a buyer, not a debtor." But Atlanticus is neither a buyer nor seller in the secondary market; it is the debt issuer.

Atlanticus cannot be both the debt issuer and a buyer in the secondary market where its notes are bought and sold. When a debt holder offers to sell the

13

debt he owns to a buyer on the secondary market, the two parties have no relationship before or after the sale of that note, even if the buyer accepts the seller's offer. But when a debt holder negotiates to sell his note back to the debt issuer, the two parties have a preexisting relationship leading up to the offer. The debt holder has depended on the issuer's solvency; the debt holder receives periodic interest payments from the issuer; and the issuer has far more information about the value of its debt than any buyer on the secondary market. If the debt issuer rejects the debt holder's offer to sell now, the debt issuer retains its obligation to repurchase the note when it matures. And if the debt issuer extinguishes its debt by accepting the debt holder's offer, the issuer does not then receive interest payments from itself. Atlanticus is not a buyer in the secondary market.

Atlanticus and the noteholders were in a debtor-creditor relationship before the noteholders' collective activity began. Each hedge fund individually purchased the debt on the secondary market. The hedge funds did not purchase the debt as a group; they acted together only after the debt was purchased to ensure that they would be paid when the debt matured. See Falstaff Brewing Corp. v. N.Y. Life Ins. Co., 513 F. Supp. 289, 293 (N.D. Cal. 1978) ("[The defendants] were not competing with the banks or other institutions to offer or to supply Falstaff with more credit, but were attempting to secure that credit which they had already

14

extended, the terms of which had already been negotiated.  This is in fact the very opposite of price-fixing.").  The parties are in a preexisting debtor-creditor relationship, and the noteholders have rights that they can exercise against Atlanticus because Atlanticus is the debt issuer.  When Atlanticus offered to repurchase its notes, the noteholders had the right to continue a buy-and-hold strategy and await the 2012 put option or the 2025 and 2035 maturity dates.  And when the noteholders proposed a repurchase of the debt, Atlanticus was free to accept their offer, make a counteroffer, or walk away.

Coordination among existing creditors "is commonly in the interests of all parties." Sharon Steel, 691 F.2d at 1052; see also Marcel Kahan & Edward Rock, Hedge Fund Activism in the Enforcement of Bondholder Rights, 103 Nw. U. L. Rev. 281 (2009) (examining the superior monitoring power of hedge funds that hold corporate debt compared to indenture trustees).  In Sharon Steel, Judge Winter highlighted the value of creditors acting jointly:  If creditors can mutually refinance the debt they hold, then it maximizes the repayment for all, gives the debtor a chance at survival, avoids bankruptcy, and reduces the cost of borrowing going forward.  691 F.2d at 1052.  But if creditors are forced to act individually, then each creditor is "compelled to resort to the most extreme action available in order to protect its individual interest." Id.  Carried to this extreme, creditors could force acceleration of repayment on a bond and ultimately drive the debtor to

15

bankruptcy.  Because coordination is in the interest of both creditors and debtors, coordination is not anticompetitive.  In United Airlines, Judge Easterbrook explained that "[c]ompetition comes at the time loans are made," 406 F.3d at 921, or, in this appeal, when the debt was purchased on the secondary market.  Creditors who later cooperate "in an effort to collect as much as possible of the amounts due under competitively determined contracts" are not engaged in "the sort of activity with which the antitrust laws are concerned."  Id.

The decisions in Sharon Steel and United Airlines, which also involved preexisting debtor-creditor relationships, are instructive.  In Sharon Steel, the debtor announced plans to liquidate the company.  691 F.2d at 1045–46.  In response, the creditors collectively demanded that the debtor pay off its debt within thirty days or set aside cash to secure the debt.  Id.  After the liquidation, Sharon Steel, the successor company, alleged that the creditors' collective activity violated the Sherman Act.  The Second Circuit described those claims as "border[ing] on the frivolous":  "While there can be little question that the Indenture Trustees engaged in concerted activity, Sharon has not shown any anticompetitive purpose or effect injurious to consumer welfare."  Id. at 1052.  In United Airlines, United leased some of its aircraft from a group of lessors.  406 F.3d at 921.  After United defaulted on the lease payments and entered bankruptcy, the lessors demanded that

16

United return the aircraft or cure its default.  Id.  The court held that the coordinated effort of the lessors did not violate the antitrust laws.   Id.

The same kind of coordination among creditors occurred here.  Atlanticus announced a dividend and tentative plans to spin off part of its company.  Although not insolvent, the company admitted that it had "no meaningful access to liquidity" and that the decline of the economy was a risk factor for investors.  The announcement of the dividend paired with the company's liquidity crisis and the collapse of the subprime lending market created uncertainty on the part of the noteholders.  To address that uncertainty, the noteholders filed this lawsuit to enjoin the dividend on the ground that it amounted to a fraudulent transfer.  And they collectively attempted to refinance the debt.  These collective actions parallel the actions taken by the lenders in Sharon Steel and the lessors in United Airlines.  All three groups of creditors already owned the debt, and they worked collaboratively to secure the repayment of that debt. This collective activity does not violate the Sherman Act.

Atlanticus attempts to distinguish Sharon Steel and United Airlines on the ground that the collaborators in those cases were indenture trustees, not debt holders, but the Trust Indenture Act contemplates coordinated action by trustees and debt holders.  The Act created trustees to serve as agents for debt investors and to aid in the enforcement of indentures because "concerted action by such

17

investors" could be "impracticable" due to "the wide dispersion of such investors through many States."  15 U.S.C. § 77bbb(a)(1).  The Act did not empower trustees to work collectively to the exclusion of the debt holders.  Instead, it appointed trustees to work on behalf of debt holders.  The text of the Act renders the actions of the trustees in Sharon Steel and United Airlines indistinguishable from the debt holders in this appeal.

Every authority cited by Atlanticus to support its antitrust claim is distinguishable.  Negotiations between a creditor and a debtor to refinance debt are different from negotiations between two parties not bound by an existing agreement who negotiate a sale of services, goods, or credit.  Atlanticus cites Federal Trade Commion v. Superior Court Trial Lawyers Association, for example, but Trial Lawyers involved future contracts to represent indigent defendants.  493 U.S. 411, 415–16, 110 S. Ct. 768, 771–72 (1990) ("[A]bout 90 percent of the [lawyers] refused to accept any new assignments." (emphasis added)).  Atlanticus also relies upon Klor's v. Broadway-Hale Stores, Inc., which involved a refusal to deal, but that refusal was for future sales of radios, television sets, and other appliances.  359 U.S. 207, 213, 79 S. Ct. 705, 710 (1959).  Atlanticus also cites Catalano, Inc. v. Target Sales, Inc., but that decision involved a group of wholesalers that ended the practice of giving credit to retail purchasers only for future retail purchases.  446 U.S. 643, 644–45, 100 S. Ct. 1925, 1926

18

(1980); see also United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 181–89, 60 S. Ct. 811, 826–29 (1940) (involving inflated purchases of gasoline not part of a long-term contract).  None of the conspirators in Trial Lawyers, Klors, Catalano, or Socony-Vacuum Oil had an incentive to keep the plaintiffs financially afloat and maximize a return on a preexisting investment; the conspirators were in a take-it-or-leave-it position with no underlying obligations left to be repaid.

*B. The Noteholders Were Not Bound To Negotiate Exclusively as a Group.*

The presence of a secondary market does not distinguish this appeal from the decisions in Sharon Steel or United Airlines because the negotiations between the group of noteholders and Atlanticus were not the exclusive mechanism for each noteholder to sell its debt.  Because each noteholder was free to accept the tender offer, resell the notes to Atlanticus on individually negotiated terms, sell the notes on the secondary market, or hold the notes until they matured, the group negotiations did not distort the secondary market.  Exclusive agreements among potential competitors are dangerous, but when the noteholders acted together to secure their debt, they were securing their debt in an efficient manner, not in an exclusive manner.

To illustrate this point, imagine a group of artists who agree to license their copyrights as a bundle of copyrights exclusively through a clearinghouse.  This agreement is an exclusive agreement because no one artist can license his

19

copyright to a buyer except through the clearinghouse. The clearinghouse is the only seller of the copyrights and could artificially inflate the price of licenses. This exclusive agreement is an anticompetitive cartel.

Next imagine a licensure regime that is not exclusive, but is no less efficient: an artist can license his copyright through the clearinghouse or individually sell a license to a buyer. That regime is not exclusive because each artist can negotiate with buyers outside of the clearinghouse. The possibility of one-on-one negotiations between the artist and a licensee disciplines the clearinghouse when it sets its prices because the clearinghouse cannot price the bundled licenses artificially high unless it wishes to go out of business. In this regime, the clearinghouse would likely price in the efficiency of a one-time purchase of the bundle of licenses, instead of many purchases of individual licenses, but that slightly higher price would not be artificially high. If the clearinghouse continues to exist, even though it is not the exclusive seller of copyright licenses, its continued existence suggests that the clearinghouse is a more efficient way to license copyrights. The clearinghouse is procompetitive.

The nonexclusive license regime mirrors the facts of Broadcast Music, in which the Supreme Court ruled that not all agreements that look like price fixing are per se illegal price-fixing agreements under the Sherman Act. 441 U.S. at 23–24, 99 S. Ct. at 1564 ("[T]he blanket license cannot be wholly equated with a

20

simple horizontal arrangement among competitors. . . . The individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing in such other markets."). Broadcast Music illustrates that many agreements that bring together competitors are procompetitive, and the cooperation among the noteholders is no exception.

Collective action in capital markets is far from categorically anticompetitive. The Sherman Act has a role in maintaining efficient capital markets, but the Act does not curtail activity that is procompetitive. See Herbert Hovenkamp, Antitrust Violations in Securities Markets, 28 J. Corp. L. 607, 608–09 (2003) ("Its purpose is not to create a code of fair dealing or to protect little traders as such."). In the securities context, for example, the Williams Act explicitly anticipates collective action by both tender offerors and offerees. 15 U.S.C. § 78n(d)(2) ("When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for purposes of this subsection."); see also Kalamnovitz v. G. Heileman Brewing Co., Inc., 769 F.2d 152 (3d Cir. 1985) (stating that, in the context of a takeover, "[t]he antitrust laws simply were not designed to regulate this type of corporate power struggle"); Finnegan v. Campeau Corp., 915 F.2d 824, 828–30 (2d Cir. 1985) (concluding that rival bidders who collude to make a joint bid for a takeover are exempt from the

21

Sherman Act); Hovenkamp, supra, at 620–21 (discussing procompetitive effects of joint bidding in securities purchases).

And in this debtor-creditor context, the procompetitive effect of the noteholders' collective activity is even more pronounced. Their collaboration to obtain the maximum repayment for the debt that they purchased has two procompetitive effects. The primary effect is that the debt holders have an incentive to keep the debtor solvent because the value of their investment in the debt depends on the debtor's ability to pay its debts as they mature. This incentive prevents debt holders from driving up any refinancing demands to artificially high levels. If the debtor goes broke, the debt holders do not get paid. Even if a group of debt holders collectively demands an artificially high price for the debt, the group is not the exclusive mechanism for an individual debt holder to resell the debt he owns. This lack of exclusivity acts as a check on the collective demands of the group. Any individual debt holder can abandon the group and resell its debt to the debtor if it fears the group is pushing the debtor toward insolvency, and as debt holders abandon the group, the group either disbands or adjusts its demands to more reasonable terms. The secondary effect is that, when debt holders work collectively to achieve the maximum repayment for the debt they own, debt issuers can negotiate lower interest rates for future sales of debt. As a consequence, the credit market becomes cheaper for debtors. The Sherman Act plays no role in

22

policing collective activity where the effects of that collective activity are both procompetitive and a "redeeming virtue" of debt holders working together.

### III. CONCLUSION

When debt holders collaborate to secure the debt that they already own, their actions are procompetitive and cannot constitute a <u>per se</u> violation of the Sherman Act. I agree with the majority opinion that <u>res judicata</u> bars this counterclaim, but I write separately to underscore that the noteholders' collaboration was not <u>per se</u> illegal. The district court correctly concluded that the counterclaim failed as a matter of law.

23